Elizabeth HALBERG, Appellant,

v.

STATE of Alaska, Appellee.

No. A–3733.

Court of Appeals of Alaska.

Sept. 29, 1995.

Hearing Denied Jan. 5, 1996.

Margi Mock, Assistant Public Defender, and John B. Salemi, Public Defender, Anchorage, for Appellant.

Cynthia L. Herren, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

*OPINION*

MANNHEIMER, Judge.

Elizabeth Halberg was convicted of second-degree murder, AS 11.41.110(a)(1), following a jury trial in the superior court. In our previous decision in this case, *Halberg v. State,* Memorandum Opinion and Judgement No. 2685 (Alaska App., April 28, 1993), we held that Halberg's first statement to the Alaska State Troopers was taken in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We remanded Halberg's case to the superior court so that it could determine (a) whether Halberg's subsequent statements to the troopers were tainted by this *Miranda* violation at the first interview and (b) whether Halberg should receive a new trial on account of the now-suppressed evidence.

On remand, Superior Court Judge Peter A. Michalski found that Halberg's subsequent statements to the troopers were voluntary and were made after Halberg had received proper *Miranda* warnings. Judge Michalski therefore found that these subsequent statements were not tainted by the *Miranda* violation at the first interview. Halberg appeals this decision. We affirm.

According to the State's theory of this case, Halberg stabbed her husband Walter

"Hank" Halberg during an argument in their home in Ekwok sometime during the early morning of January 4, 1989. We summarized the pertinent facts in our earlier opinion:

Walter Halberg woke up and decided that he wanted to leave [the house]. [Elizabeth] Halberg either did not want him to go or wanted to go with him; the couple argued. During this argument, Halberg stabbed her husband in the chest with a kitchen knife. Walter sat down at the kitchen table and died. Meanwhile, Halberg fell asleep on the bed.

Halberg woke up and went to [her brother-in-law] John King's house at about 5:00 a.m.; she told King that something was wrong.... King returned with Halberg to her cabin and realized almost immediately that Walter Halberg was dead. King tried to convince Halberg to come away from the cabin with him, but Halberg insisted on staying with her husband. King returned home and called [Village Public Safety Officer] [Phillip] Akelkok at approximately 7:15 a.m. to report the situation.

Akelkok went to the Halberg cabin, where he found Walter Halberg dead and Elizabeth Halberg asleep. Akelkok called his supervisor, State Trooper Bittick, in King Salmon. Akelkok received instructions to seal the home and take Halberg to a relative's house until other police officials arrived.

Akelkok entered the cabin and shook [Elizabeth] Halberg awake. Halberg protested that she wanted to stay with her husband, but Akelkok and Leroy Wallona, a local resident, escorted Halberg from the house. On their way, Halberg kept repeating that "Hank" (Walter Halberg's nickname) had made her do it, that she had to do it, and that she had not meant to hurt him. The two men brought Halberg by her family's home, but either she did not want to go inside or her parents would not let her in, so she was taken to King's house.

Trooper Bittick arrived in Ekwok around 10:30 that morning. After Akelkok briefed him, Bittick went to the Halberg

cabin, took photographs, and placed Walter Halberg's body into a body bag. The cabin bore no evidence of a struggle, and the stab wound to Walter Halberg's chest was not immediately apparent; Bittick at first believed that Walter had died of natural causes. Later that morning, however, King told Bittick that Halberg admitted to him that she had stabbed her husband; Bittick re-examined Walter's body and confirmed that the death was a homicide.

*Halberg,* Memorandum Opinion and Judgement No. 2685, pp. 3–4.

Bittick went to the King residence around noon on January 4, 1989 to interview Halberg. Bittick administered *Miranda* warnings to Halberg, and Halberg told Bittick that she understood her rights. Bittick then asked Halberg if she was willing to speak to him. Halberg replied, "Don't ask me questions. My husband, he's—he went and go visit." Rather than ceasing the interview, Bittick began questioning Halberg. Asked to explain how her husband had died, Halberg told Bittick that her husband had stabbed himself:

BITTICK: You remember you stuck him with a knife last night?

HALBERG: I didn't stick nobody with a knife. He did it to him[self].

Q: You said earlier . . .

A: He did it himself. . . . You want to see the knife he did it with? . . . He said, . . . "Watch me. Watch me do it, you bitch." . . . He told me, he said, "Watch me, bitch. I could do it."

Q: Why did you tell them [King and Akelkok] earlier that you stuck, you stabbed him?

A: [I] did nothing to him. I said I hurt him; I hurt him.

Q: You hurt?

A: I hurt him.

Q: Yeah, you said . . .

A: His feelings were hurt, and he said he was gonna do it, and I looked at him, I said, "Hank, you can't do it." He said, "Watch me, you fucking whore. Watch me, you fucking bitch." And he did it.

Q: Where did the knife go? Did you take the knife then?

A: I took [it] and washed it up[.]

. . . .

My husband, he did it. I didn't want him to, but he did it. . . . I want Hank here. He said he could do it; he said he could do it[.] . . . Take his own, he take his own fucking knife, he take his own knife, and [he] did it. He said, "Nobody loves me here[.]" Oh, but I love him; I loved him. Die myself—I wish to God I would die myself. . . . Nobody's fault.

After hearing this answer, Bittick stopped questioning Halberg because he believed that she had become too emotional to continue the interview. Instead, Bittick told Halberg, "Okay, Lisa, why don't you [lie] down and get some sleep, and we'll talk again later. Okay, just go ahead and [lie] down and get some sleep." Halberg's reply, "Turn the light off", is the last statement of the interview.

As indicated, Bittick left Halberg sleeping at John King's house. Bittick did not place Halberg under arrest.

That evening, Trooper Ron Belden arrived in Ekwok. At approximately 7:30 p.m., or about seven hours after the first interview, Belden and Bittick conducted a second interview with Halberg at the Ekwok city offices. A third interview was conducted the next day (January 5th) at the Village Public Safety Office, and three additional interviews were conducted on January 6th and 7th—at the village teachers' housing, at Halberg's residence, and again at the city offices. Halberg was never in custody during this time.

As noted earlier, we held in our previous decision in this case that Trooper Bittick violated *Miranda* when he continued to question Halberg after she told him, "Don't ask me questions." Because of this *Miranda* violation, we directed the superior court to suppress the statements Halberg made during that first interview. We then asked the superior court to determine whether any other evidence should be suppressed on account of this *Miranda* violation.

On remand, Judge Michalski found that the second and subsequent interviews were not tainted by the *Miranda* violation that

occurred at the first interview. In his written decision, Judge Michalski acknowledged:

> [S]everal portions of the second [and subsequent interviews with] Halberg contain references by the interrogators to [Halberg's] first statement, or rely on knowledge [obtained] from the first statement.... [All] statements subsequent to the first one ... relate back to one or more prior statements and thus could properly be said to be the fruit of the initial statement[.] ... [T]he court does not believe that ... it can conclude beyond a reasonable doubt that the contents of the second and subsequent statements would be the same without the first statement. Indeed, such a conclusion is impossible given the fact that the officers at various points refer back to prior answers or statements.

Nevertheless, Judge Michalski noted that Halberg's initial statement was voluntary, despite the *Miranda* violation. (Judge Michalski originally made this finding during the initial trial court proceedings, and we affirmed this finding on appeal.) Judge Michalski found that Halberg's second and subsequent statements were also voluntary, and that Halberg made those subsequent statements after receiving proper *Miranda* warnings and after explicitly waiving her privilege against self-incrimination. Judge Michalski concomitantly found that the troopers had not "recklessly run roughshod over [Halberg's] rights", nor had they "act[ed] with disregard to [Halberg's] condition" nor "intentionally manipulate[d], frighten[ed,] or abuse[d] [Halberg] in order to obtain a desired statement". Citing the United States Supreme Court's decision in *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), Judge Michalski declared that Halberg's second and subsequent statements were admissible.

On appeal, Halberg argues that, once Judge Michalski found her subsequent statements to be the "fruit" of her initial statement, the judge was obliged to suppress those subsequent statements. She argues that Judge Michalski misinterpreted *Oregon v. Elstad*; alternatively, she argues that this court should refuse to follow *Elstad* and

should instead declare that the Alaska Constitution requires a different rule.

In essence, Halberg argues that the Alaska Constitution requires that we continue to apply pre-*Elstad* law. We find it unnecessary to resolve this issue. Even applying pre-*Elstad* law to the facts of this case as found by Judge Michalski, we conclude that Halberg's subsequent statements are not the "fruit" of her initial statement, at least as that term is normally employed for purposes of the exclusionary rule. Moreover, even though Judge Michalski purported to rely on *Elstad* as the legal basis for his ruling, Halberg's case does not raise any issue under *Elstad*. To explain our analysis of Halberg's case, it is helpful to summarize the state of the law before *Elstad*.

### The Law Before Oregon v. Elstad

Under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), a criminal defendant can seek suppression of his or her statements to the police on the ground that those statements are tainted by a prior illegality. For instance, a defendant may claim that his or her confession is the product of statements made at an earlier interview in which the police violated the defendant's privilege against self-incrimination.

There are, generally speaking, two ways in which the police may violate a defendant's privilege against self-incrimination. First, the police may use interrogation methods so coercive as to "overbear [the suspect's] will to resist and bring about confessions not fairly self-determined". *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961). In such cases, the defendant's confession is deemed involuntary, and it must be suppressed. Second, the police may violate the rules established in *Miranda* and succeeding cases—the rules governing the police's duty to inform an arrested suspect of the rights to silence and to counsel, to obtain a waiver of these rights before custodial interrogation, and to respect a suspect's invocation of these rights. Even if the defendant's statement is voluntary, the *Miranda* violation constitutes an independent ground for suppression.

Before *Elstad,* courts used one legal test to analyze whether a previous Fifth Amendment violation (either an involuntary statement or a statement taken in violation of *Miranda*) tainted a defendant's subsequent statement. As a preliminary matter, the government had to show that the defendant's subsequent statement was voluntary and, if the defendant was in custody during the subsequent interrogation, that the defendant received proper *Miranda* warnings and waived his or her rights. Assuming these foundational matters were proved, courts then analyzed the totality of the circumstances to assess whether the defendant's decision to give a subsequent statement was "sufficiently an act of free will to purge the primary taint". *Brown v. Illinois,* 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975), citing *Wong Sun,* 371 U.S. at 486, 83 S.Ct. at 416. Or, as stated in *Clewis v. Texas,* 386 U.S. 707, 710, 87 S.Ct. 1338, 1340, 18 L.Ed.2d 423 (1967), courts were to assess whether there was a "break in the stream of events ... sufficient to insulate the [subsequent] statement from the effect of all that went before".

While *Brown* involved the claim that a defendant's statement was tainted by his prior illegal arrest (a Fourth Amendment violation), the Supreme Court required the same analysis in cases involving violations of the Fifth Amendment. *See Westover v. United States* (a companion case of *Miranda*), 384 U.S. 436, 494–96, 86 S.Ct. 1602, 1638–39, 16 L.Ed.2d 694 (defendant's prior statement was taken in violation of *Miranda*); *Clewis v. Texas,* 386 U.S. at 710–11, 87 S.Ct. at 1340 (defendant's prior confession was involuntary). *See also United States v. Bayer,* 331 U.S. 532, 540, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654 (1947); *Holland v. McGinnis,* 963 F.2d 1044, 1050 (7th Cir.1992); *United States v. Wauneka,* 770 F.2d 1434, 1441 (9th Cir.1985) (discussing other cases involving prior involuntary confessions).

In *Brown,* the government argued that the taint of a prior illegality could always be negated by giving the defendant *Miranda* warnings. The government asserted that, once the defendant understood that he or she need not say anything to the police, any knowing and voluntary decision to waive that right necessarily constituted an independent act of will that broke the "stream of events". The Supreme Court rejected the government's argument:

[The fact that the defendant received] *Miranda* warnings [before the subsequent statement is] an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But [this] is not the only factor to be considered. The temporal proximity of the [initial illegality] and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant.

*Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62 (footnotes and citations omitted).

At the same time, the *Brown* Court explicitly rejected the notion that the taint flowing from a prior violation of a defendant's rights could be assessed using a causality or "but for" test. That is, the Court refused to accept the argument that suppression should invariably be required whenever the defendant's subsequent statement was the result of prior illegality.

While we ... reject the [rule that *Miranda* warnings will always cure a prior illegality], we also decline to adopt any alternative *per se* or "but for" rule.... The question whether a [subsequent] confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit [the answer] to turn on such a talismanic test.

*Brown,* 422 U.S. at 603, 95 S.Ct. at 2261.

Rather, all the circumstances of the defendant's particular case had to be assessed to determine the effect of the prior illegality on the defendant's later decision to submit to police questioning. As later expressed by the Seventh Circuit, "the issue is not causation, but the degree of improper coercion". *Holland v. McGinnis,* 963 F.2d 1044, 1051

(7th Cir.1992).[1]  *Accord United States v. Leon Guerrero*, 847 F.2d 1363, 1366 n. 1 (9th Cir.1988); *Leon v. Wainwright*, 734 F.2d 770, 772–73 & n. 3 (11th Cir.1984).

■ The decision whether a defendant's statements are or are not tainted by a prior illegality is ultimately a question of law. While a reviewing court accepts the trial court's findings of historical fact (unless they are shown to be clearly erroneous), the reviewing court independently determines whether, under those facts, the defendant's decision to speak with the police was voluntary and sufficiently insulated from the prior illegality to escape its taint. *Dulier v. State*, 511 P.2d 1058, 1060 (Alaska 1973).  *Accord United States v. Robinson*, 20 F.3d 320, 322 (8th Cir.1994); *Holland v. McGinnis*, 963 F.2d 1044, 1050 (7th Cir.1992); *United States v. Anderson*, 929 F.2d 96, 99 (2nd Cir.1991); *United States v. Lewis*, 833 F.2d 1380, 1384 (9th Cir.1987).

### The Elstad Decision

In *Oregon v. Elstad*, the Supreme Court distinguished between (1) cases in which the prior illegality is an involuntary confession, and (2) cases in which the prior illegality is a *Miranda* violation.  The defendant in *Elstad* was arrested on suspicion of burglary; two police officers came to his home, armed with an arrest warrant.  After serving the arrest warrant, one of the officers questioned Elstad without giving him *Miranda* warnings or securing a waiver of his rights.  Elstad told the officer that he had been present during the burglary.  The officers then transported Elstad to the police station,

where he was held in custody.  One hour later, Elstad was interrogated by the same two officers.  This time, the officers read Elstad the *Miranda* warnings and secured a waiver of Elstad's rights.  Elstad again confessed, this time in more detail.  *Elstad*, 470 U.S. at 301–02, 105 S.Ct. at 1288.

The government conceded that Elstad's first statement should be suppressed because of the *Miranda* violation.  *Elstad*, 470 U.S. at 302, 105 S.Ct. at 1289.  However, the government contended that Elstad's subsequent confession at the police station was not tainted by the prior brief interrogation at his home.  *Id.*  The Oregon Court of Appeals disagreed.  Applying a "totality of circumstances" test, and quoting *Clewis v. Texas*, 386 U.S. at 710, 87 S.Ct. at 1340, the Oregon court found that "there was [not] a sufficient break in the stream of events between [the] inadmissible statement and the [later] confession to insulate the latter statement from the effect of what went before".  *Elstad*, 470 U.S. at 303, 105 S.Ct. at 1289–1290.  The Oregon court relied heavily on the short amount of time between Elstad's two statements, as well as on the fact that, in his first statement, Elstad had "let the cat out of the bag" by essentially admitting his participation in the burglary.  "[T]he coercive impact of [the] unconstitutionally obtained statement remain[ed], because in [the] defendant's mind it ha[d] sealed his fate."  *Id.*, 470 U.S. at 303, 105 S.Ct. at 1290.

Reversing the Oregon court, the United States Supreme Court declared that, in cases involving the claim that a defendant's statements were tainted by a prior illegality, a

---

1. *See*, for example, *Hutto v. Ross*, 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976) (per curiam).  The defendant, who had already concluded a plea bargain with the government, acceded to a government request to be interviewed by government agents and speak about the crime, even though this was not part of the plea bargain.  During the interview, the defendant confessed to the crime charged against him.  Thereafter, the plea agreement fell apart, and the defendant asked the court to prohibit the government from using his confession.  He argued that his confession should be considered a statement "made in connection with an offer to plead guilty".  The Eighth Circuit agreed with the defendant, but the Supreme Court reversed.  The Supreme Court stated:

> The only question in this case is whether a confession is *per se* inadmissible ... because it was made subsequent to an agreed upon plea bargain that did not call for such a confession. . . .  The Court of Appeals reasoned that respondent's confession was made "as a result of the plea bargain" and would not have been made "but for the plea bargain."  But causation in that sense has never been the test of voluntariness.  The test is whether the confession was extracted by any sort of threats or violence, or [was] obtained by any direct or implied promises, however slight, or by the exertion of any improper influence.

*Hutto v. Ross*, 429 U.S. at 30, 97 S.Ct. at 203–04 (footnote, citations, and quotations omitted).

distinction had to be drawn between involuntary confessions and *Miranda* violations. A "break in the stream of events" would continue to be required for cases involving a prior involuntary confession, because an involuntary confession, by definition, violates the defendant's constitutional rights under the Fifth Amendment. However, the Court declared, a *Miranda* violation does not necessarily show that the defendant's Fifth Amendment rights were violated:

> [While] [t]he *Miranda* exclusionary rule ... serves the Fifth Amendment[, it] sweeps more broadly than the Fifth Amendment itself. [The *Miranda* rule] may be triggered even in the absence of a Fifth Amendment violation. The Fifth Amendment prohibits use ... only of *compelled* testimony.... [U]nwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless by excluded from evidence under *Miranda*. Thus, in the individual case, *Miranda*'s preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm.

*Elstad,* 470 U.S. at 306–07, 105 S.Ct. at 1291–92 (emphasis in the original).[2]

Thus, the Supreme Court held, when the prior illegality involves only a *Miranda* violation and not an involuntary confession, "a careful and thorough administration of the *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible", even when there has been no identifiable break in the action. *Elstad,* 470 U.S. at 310–11, 105 S.Ct. at 1294. In such cases, the Court declared, the *Miranda* warning given before the defendant's subsequent interview "conveys the relevant information[,] and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an 'act

of free will'." *Elstad,* 470 U.S. at 311, 105 S.Ct. at 1294 (quoting *Wong Sun,* 371 U.S. at 486, 83 S.Ct. at 416).

The Court explicitly rejected the Oregon court's "cat out of the bag" analysis—the theory that, having once confessed, a defendant would drop his or her psychological defenses to further interrogation because the defendant would feel that his or her fate was already sealed. The Court rejected this "cat out of the bag" analysis both because the Court disagreed with the psychological theory underlying it and because such a rule would lead to anomalous results.

Regarding the psychological underpinnings of the "cat out of the bag" theory, the Court stated:

> There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a "guilty secret" freely [made] in response to an unwarned but noncoercive question[.] ... Certainly, in respondent's case, the causal connection between any psychological disadvantage created by his admission [at the time of his arrest] and his ultimate decision to cooperate [with the authorities] is speculative and attenuated at best. It is difficult to tell with certainty what motivates a suspect to speak.... We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion.

*Elstad,* 470 U.S. at 312–14, 105 S.Ct. at 1295–96.

Regarding the anomalous results of the proposed "cat out of the bag" rule, the Court

---

**2.** This view—that *Miranda* "sweeps broader" than the Fifth Amendment—was reiterated in *Michigan v. Harvey,* 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990):

> Although recognizing that *Miranda* rules would result in the exclusion of some voluntary and reliable statements, the Court imposed these "prophylactic standards" on the States, *see Michigan v. Tucker,* 417 U.S. 433, 446, 94 S.Ct. 2357, 2364–65, 41 L.Ed.2d 182 (1974), to

> safeguard the Fifth Amendment privilege against self-incrimination.... [These] procedural safeguards ... are "not themselves rights protected by the Constitution," *Tucker, supra,* 417 U.S. at 444, 94 S.Ct. at 2364, ... but are instead measures designed to insure that constitutional rights are protected.

*Harvey,* 494 U.S. at 350–51, 110 S.Ct. at 1180–81.

perceived that, if the lingering "psychological effects of *voluntary* unwarned admissions" (emphasis in the original) were to taint any later decision to speak, such a rule "would, practically speaking, disable the police from obtaining the suspect's informed cooperation" even when the police had never violated the suspect's Fifth Amendment rights. *Elstad,* 470 U.S. at 311, 105 S.Ct. at 1294. A "cat out of the bag" rule would mean that voluntary statements taken in violation of *Miranda* would be considered more tainted than involuntary confessions extorted by violence or threats of violence:

> [E]ven in such extreme cases as *Lyons v. Oklahoma,* 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944), in which police forced a full confession from the accused through unconscionable methods of interrogation, the Court has assumed that the coercive effect of the confession could, with time, be dissipated.

*Elstad,* 470 U.S. at 311–12, 105 S.Ct. at 1294.

Thus, the Supreme Court in *Elstad* declared a new rule for cases in which a defendant's initial confession was voluntary but obtained through a *Miranda* violation. As explained above, in *Brown v. Illinois* the Supreme Court declared that the administration of *Miranda* warnings and a defendant's subsequent voluntary decision to submit to police questioning were not sufficient, in themselves, to erase the taint of a prior Fourth Amendment violation. Until *Elstad,* this rule applied to all Fifth Amendment violations too. But in *Elstad,* the Court held that if the prior illegality was a *Miranda* violation, and if the defendant later voluntarily chose to submit to further questioning after receiving proper *Miranda* warnings, these warnings and that voluntary decision will ordinarily be sufficient to dissipate the taint of the prior *Miranda* violation. The defendant's prior unwarned confession will not, of itself, taint the defendant's subsequent decision to waive his or her rights and speak to the police, so long as "the officers [do not] exploit the unwarned admission to pressure [the defendant] into waiving his [or her] right to remain silent". *Elstad,* 470 U.S. at 316, 105 S.Ct. at 1296.

### Halberg's Case

We now return to the facts of Halberg's case. Judge Michalski ruled that Halberg's second and subsequent interviews with the troopers were the "fruit" of her initial interview with Trooper Bittick because, at various places in the subsequent interviews, the troopers explicitly referred to statements Halberg made at the first interview or they relied on knowledge obtained from Halberg's answers at the first interview. In other words, Judge Michalski found that the second and subsequent interviews were the "fruit" of the first interview because the content of the second and subsequent interviews would have been different had it not been for the statements Halberg made during the first interview.

As explained above, even under pre-*Elstad* law it was error to employ this "but for" test to analyze whether Halberg's subsequent statements were the fruit of her first interview. Long before *Elstad,* the Supreme Court explicitly rejected a causation or "but for" test as the method for judging whether a defendant's statement is the result of a prior occurrence. *Brown v. Illinois,* 422 U.S. at 603, 95 S.Ct. at 2261; *Hutto v. Ross,* 429 U.S. at 30, 97 S.Ct. at 203–04.

■ The question is not whether the content of the second and subsequent interviews would have been the same if the initial interview had not taken place. Instead, the question is whether Halberg's decision to submit to the second and subsequent interviews was "sufficiently an act of free will to purge the ... taint" of the *Miranda* violation at the first interview. *Brown v. Illinois,* 422 U.S. at 602, 95 S.Ct. at 2261. Under this test, we must concentrate on Halberg's consent to participate in the subsequent interviews and decide whether this consent was tainted by the statements she made during the first interview.

Judge Michalski relied on *Elstad* when he ruled that Halberg's subsequent interviews were not tainted by the *Miranda* violation. However, under the facts of this case as found by Judge Michalski, there was no need to rely on *Elstad.* Even applying the "totality of circumstances" test of pre-*Elstad* law,

we conclude that there was a sufficient break in the "stream of events" between Halberg's initial interview and her subsequent interviews to attenuate the taint of the *Miranda* violation.

Over the years, the following factors have been used to assess whether a defendant's subsequent statement is the tainted fruit of a prior illegality: the purpose and flagrancy of the initial illegal act, the amount of time between the illegal act and the defendant's subsequent statement, the defendant's physical and mental condition at the time of the subsequent statement, whether the defendant remained in custody or was at liberty during this interval, whether the defendant had the opportunity to contact legal counsel or friends during this interval, whether the subsequent interview took place at a different location, whether the defendant's interrogators were the same officers who committed the prior illegal act, whether the evidence obtained from the prior illegal act affected the defendant's decision to submit to a subsequent interview, whether the police used lies or trickery to influence the defendant's decision, and whether there were other intervening events that affected the defendant's decision. *Holland v. McGinnis*, 963 F.2d 1044, 1050 (7th Cir.1992); *United States v. Patino*, 862 F.2d 128, 132–34 (7th Cir.1988); *United States v. Wauneka*, 770 F.2d 1434, 1440–41 (9th Cir.1985); *State v. Baruso*, 72 Wash. App. 603, 865 P.2d 512, 516–17 (1993), *review denied*, 124 Wash.2d 1008, 879 P.2d 292 (1994); *People v. Hamilton*, 831 P.2d 1326, 1332–33 (Colo.1992); *State v. Kirby*, 12 Kan. App.2d 346, 744 P.2d 146, 153 (1987), *aff'd*, 242 Kan. 803, 751 P.2d 1041 (1988).

■ Under pre-*Elstad* law, the ultimate question—whether the *Miranda* violation infected Halberg's subsequent interviews, or whether the taint of that violation was sufficiently attenuated to allow admission of Halberg's later interviews—is determined by examining all of these factors. As the Supreme Court stated in *Brown v. Illinois*, "No single fact is dispositive." *Brown*, 422 U.S. at 603, 95 S.Ct. at 2261. Analyzing Halberg's case in this fashion, we conclude that her subsequent interviews with the troopers were not tainted by the *Miranda* violation at the first interview.

Judge Michalski found that the *Miranda* violation in this case was not flagrant or purposeful. The judge concluded that "the interrogating officer ha[d] no idea that [Halberg's] initial statement [would] be found illegal", since that initial statement was "voluntary, uncoerced[,] and given [after] a *Miranda* warning". The problem, Judge Michalski declared, was that "[t]he officer should have listened more closely when seeking Ms. Halberg's waiver of *Miranda* rights." Judge Michalski explicitly found "that the police tried to comply with the duty [imposed by] *Miranda* " and that the officer "gave the full warning", but then the officer failed to "obtain a proper waiver".

There was a significant interval—approximately seven hours—between the first interview at John King's house and the second interview at the Ekwok city offices. Halberg was at liberty during this time, and she came voluntarily to the second interview. When Halberg arrived for the second interview, the troopers again administered full *Miranda* warnings to her, and Halberg expressly waived her rights and consented to speak to the troopers.

One of the factors to be considered, among the totality of circumstances, is whether the same officer conducted both interviews or whether different officers conducted the second interview. Here, two troopers conducted the second interview. One of them, Trooper Bittick, was the trooper who conducted the first interview and who violated Halberg's *Miranda* rights. However, the fact that the same officer participated in both interviews is significant only in cases where there is reason to believe that the defendant might be intimidated by the officer's presence—for example, when the officer had been overbearing or had used coercive tactics during the first interview.

The facts of Halberg's case are readily distinguishable from such cases. As described above, Trooper Bittick questioned Halberg for only a few minutes at the initial interview. After Halberg described watching her husband commit suicide, Bittick took it upon himself to end the interview because

he believed that Halberg was not in a fit emotional state to continue. He encouraged Halberg to get some sleep, and he left her at her brother-in-law's house. This record shows that Bittick did not engage in coercive interrogation methods that might have tainted Halberg's later decision to submit to renewed questioning.

It does not appear that Halberg's statements from the first interview significantly affected her willingness to engage in renewed conversation with the troopers. Halberg did not "let the cat out of the bag" at the first interview. That is, she did not confess to homicide, nor did she even admit assaulting her husband. Instead, she unequivocally stated that her husband had committed suicide.

It is true that, during the course of the second interview, the troopers referred a few times to the fact that a prior interview had taken place. It is also true that, on three or four occasions during the second interview, the troopers reminded Halberg of answers she had given during the first interview. However, all of this occurred long after Halberg had waived her rights to silence and to the assistance of counsel. The troopers never employed Halberg's prior statements to try to induce her to waive her rights (by suggesting that she might as well talk to the officers since she had already confessed).[3]

In fact, Halberg had not previously confessed. As explained above, during the first interview Halberg steadfastly maintained that her husband had committed suicide,

stabbing himself before her eyes in a fit of despondency. Halberg's statements at the first interview did not place her at a psychological disadvantage when the time came for her to decide whether or not to consent to the second and subsequent interviews.[4]

■ In Halberg's brief to this court, despite her general attack on *Elstad*, she asks us to apply *Elstad* in one respect. Halberg asserts that *Elstad* stands for the proposition that, if a defendant's first interview is taken in violation of *Miranda*, then the police are prohibited from using that first interview in any manner during subsequent interviews. However, *Elstad* does not prohibit all reference to the first interview. Rather, *Elstad* indicates that the police may not use the defendant's answers from the first interview to secure the defendant's waiver of rights at the commencement of a subsequent interview. *See Elstad*, 470 U.S. at 316, 105 S.Ct. at 1296: "Nor did the officers exploit the [defendant's] unwarned admission to pressure [the defendant] *into waiving his right to remain silent.*" (Emphasis added.)

The Supreme Court's statement must be understood in context. The *Elstad* Court had just rejected the argument that, if a defendant had previously confessed before receiving *Miranda* warnings, the defendant's later decision to again confess at a second interview would invariably be the result of psychological pressures stemming from the first confession. The Court ruled that, notwithstanding a first confession, a defendant

---

**3.** A useful comparison is found in *United States v. Carter*, 884 F.2d 368, 372–74 (8th Cir.1989), a post-*Elstad* case in which the Eighth Circuit held that the defendant's second interview with the police was tainted by a prior *Miranda* violation even though the defendant received full *Miranda* warnings before the second interview. The *Carter* court relied on two main factors. First, there had been essentially no break in time between the two interviews; "the [defendant's] second confession came almost directly on the heels of the first". *Carter*, 884 F.2d at 373. Second, it appeared that the police had pursued a conscious strategy of obtaining as much information as they could from the defendant before they administered the *Miranda* warnings; then they administered the warnings and asked the defendant to repeat all of his incriminating admissions. *Id.*

And see *State v. Nobles*, 122 Idaho 509, 835 P.2d 1320 (App.1991), *aff'd*, 122 Idaho 470, 835 P.2d 1281 (Idaho 1992), where the court said that, even though a defendant receives *Miranda* warnings before the second interview, the reviewing court still must determine whether "there is any evidence to suggest that the officers exploited unwarned admissions to pressure [the defendant] into waiving his right to remain silent" at the second interview.

**4.** Some courts have recognized that the rationale of the "cat out of the bag" theory applies only when the defendant has made statements that *the defendant* perceives to be a confession of wrongdoing. A defendant will not feel psychological pressure to waive his or her rights if the defendant does not view his or her prior statements as incriminating. *See*, for example, *United States v. Knight*, 395 F.2d 971, 975 (2nd Cir.1968).

who had received *Miranda* warnings would ordinarily be presumed to understand that he or she need not repeat that first confession or add anything to it. Having said this, however, the Court indicated that the matter would be different if the police affirmatively reminded the defendant of the previous confession and suggested that it would be pointless for the defendant to assert his or her rights.

When Halberg argues for the broader rule that the subsequent interview can not incorporate or refer to the initial interview in any manner, Halberg patently relies on the "but for" causality test that was rejected in *Brown v. Illinois*. We also note that, if *Elstad* were interpreted as Halberg suggests, it would be harder for the State to show lack of taint from a *Miranda* violation that resulted in voluntary, exculpatory statements (the situation in Halberg's case) than it is for the State to establish lack of taint from a prior involuntary confession (for example, a confession obtained by physical coercion, as in *Clewis v. Texas*). Such an interpretation of *Elstad* is not plausible.

The fact that, during the second and subsequent interviews, the troopers referred to statements Halberg had earlier made during her first interview is one factor that should be considered among all the circumstances. But a court must assess the totality of circumstances when judging whether Halberg's waiver of her rights at the second interview was knowing and voluntary, and whether the statements she then gave at the second and succeeding interviews were voluntary.

Judge Michalski found that, despite the cross-references to statements from the first interview, Halberg's subsequent statements were voluntary. We are obliged to independently assess this question. *Dulier v. State*, 511 P.2d at 1060. Having independently examined the record, we agree with Judge Michalski. The second and subsequent interviews were not tainted by the *Miranda* violation at the first interview, and Halberg's statements at these interviews are therefore admissible against her.

Judge Michalski further concluded that suppression of the first interview alone does not cast reasonable doubt on Halberg's conviction—that suppression of the first interview does not entitle Halberg to a new trial. Halberg does not challenge this ruling.

Accordingly, the judgement of the superior court is AFFIRMED.