Bruce L. MURRAY, Appellant,

v.

STATE of Alaska, Appellee.

No. A–7210.

Court of Appeals of Alaska.

Nov. 3, 2000.

Rex Lamont Butler, Rex Lamont Butler and Associates, Anchorage, for Appellant.

W.H. Hawley, Jr., Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

### OPINION

STEWART, Judge.

Bruce L. Murray appeals his convictions for second-degree misconduct involving weapons,[1] third-degree misconduct involving weapons,[2] and two counts of fourth-degree misconduct involving a controlled substance.[3] Murray raises several claims in this appeal. First, Murray argues that he was in *Miranda*[4] custody during police questioning at Third Avenue and Ingra Street in Anchorage and his statement should be suppressed because he was not advised of his rights. Second, Murray argues that, even if he was not in custody at Third and Ingra, all the evidence that the police discovered after an earlier statement in his motel room that did

---

1. AS 11.61.195, a class B felony.

2. AS 11.61.200(a)(10), a class C felony.

3. AS 11.71.040(a)(2) and (a)(5), class C felonies.

4. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

violate *Miranda* must be suppressed because the evidence was the "fruit" of that illegality. Third, Murray argues that the superior court erred by upholding a search warrant of his home. Fourth, Murray argues that the police entry into his motel room violated the Fourth Amendment, and that all evidence acquired after that entry should be suppressed. Fifth, Murray argues that the superior court should have granted a judgment of acquittal on the count of fourth-degree misconduct involving controlled substances which charged him with maintaining a place used for keeping or distributing controlled substances. Finally, Murray argues that Judge Card should have granted a judgment of acquittal on the charge of second-degree misconduct involving weapons for possessing a weapon during a felony drug offense. For the reasons expressed below, we reject all of Murray's claims except the last. On that claim, we vacate Murray's conviction and remand for further proceedings.

*Facts and proceedings*

On August 13, 1997, shortly after 5:00 a.m., an anonymous caller telephoned the Anchorage Police Department and reported that there was a dead body in Room 222 of the Mush Inn, an Anchorage motel. Anchorage Police Officers Kevin Iverson and Steven Hebbe responded to the call. When the officers arrived at the Mush Inn, the door to Room 222 was open. The officers told a security guard on the scene and Murray, the occupant of Room 222, that they were responding to the dead-body report. The officers asked to enter the room to look for the dead body. Murray consented. While the officers were checking the room, they told Murray to sit down on the bed with his hands in view. Someone at the Mush Inn front desk called the room to ask Murray about payment for the room charges. Murray asked to leave to take care of his bill, but the officers told Murray he had to wait until they were finished searching. The officers found no body.

The officers questioned Murray while they were in the room, but they did not advise him of the *Miranda* warnings or tell him he was free to leave. The officers questioned Murray for 20–30 minutes. Murray told the officers that: (1) he was on felony probation for a prior drug offense (Officer Iverson ran a check that confirmed this); (2) he had only recently returned to the room; (3) his housemate and girlfriend, Jeannie Joy, and two other people had been in the room earlier; (4) Joy was a drug user, but he did not know whether she had drugs; (5) he had given Joy money to buy cocaine; (6) he had consumed some cocaine, and a urinalysis for cocaine would probably be positive; and (7) Joy still had the cocaine and was driving his Chevy Blazer around town.

The officers asked to search the room for drugs and Murray agreed to a search of the room for that purpose. The officers found a single-serving plastic alcohol bottle with a hole cut in it that could be used to smoke crack cocaine.

The officers departed to look for Joy. They left Murray behind. The officers hoped to recover the Blazer for Murray and to search it for drugs.

Officer Hebbe spotted Murray's Blazer and stopped it at Third Avenue and Ingra Street. Joy and another person were inside the Blazer. Officer Iverson returned to the Mush Inn and told Murray that the police found his Blazer and asked Murray for his consent to search the Blazer. Murray gave that consent. Officer Iverson relayed the consent to Officer Hebbe.

Meanwhile, Joy was talking with the police and reported (1) that there was marijuana in the Blazer; (2) that Murray had given her the marijuana to sell; (3) that Murray grew marijuana; and (4) that Murray owned a firearm and had a prior drug conviction. The officers searched the Blazer and found marijuana and a crack pipe. About this time, Murray drove to Third and Ingra in his truck and parked behind the line of vehicles.

The officers questioned Murray about Joy's claims. Murray admitted that he had given marijuana to Joy to sell and that he had about a quarter of a pound of marijuana and a handgun at his home.

Murray drove to his home and the officers followed. The officers asked Murray to consent to a search of his home. At first, Mur-

ray agreed, but when the officers presented him with a consent-to-search form he asked for an attorney.

Because Murray withdrew his consent, the officers obtained a search warrant for Murray's residence. During the execution of the warrant, the police found the following items: (1) a bag containing 170.9 grams (approximately 6 ounces) of "bud" marijuana in a living room closet; (2) a screening tin (used to separate "bud" from "shake") and a gram scale in the kitchen; (3) marijuana residue in a bedroom drawer and in the screening tin; (4) a loaded .44 magnum handgun inside a "fur-lined case" in the bedside table drawer; and (5) a gun cleaning kit and boxes of ammunition in a bucket in the bedroom. In the handgun case, the officers later found a marijuana "bud."

The grand jury indicted Murray for the following offenses: one count of fourth-degree misconduct involving a controlled substance for possession of one ounce of marijuana with intent to deliver; another count of fourth-degree misconduct involving a controlled substance for maintaining a dwelling for keeping or distributing controlled substances; one count of second-degree misconduct involving weapons for possession of the .44 magnum handgun during the commission of a felony drug offense; one count of third-degree misconduct involving weapons for being a felon in possession of a firearm capable of being concealed on one's person;[5] and another count of third-degree misconduct involving weapons for being a convicted felon and living in a dwelling knowing that a firearm was present in the dwelling.

Murray moved to suppress the evidence acquired in Room 222, including his statements to the police, claiming that the police violated the Fourth Amendment and did not advise him of his *Miranda* rights. He also claimed that evidence obtained after the police left the room should be suppressed as the fruit of this police illegality. Following an evidentiary hearing, Superior Court Judge Milton M. Souter found that Murray was in custody for purposes of *Miranda* in his motel room. Because Murray was not given *Miranda* warnings, Judge Souter sup-

pressed the statements Murray made in Room 222. However, Judge Souter refused to suppress any statements after the police left Room 222 or any physical evidence. Judge Souter found that Murray voluntarily consented to the officers' entry into and search of his motel room. He further found that the weight of the evidence indicated that the police went to Room 222 due to a report of a dead body, and not on a "ruse." Finally, Judge Souter found that Murray voluntarily consented to the search of his Blazer.

Murray filed a motion for reconsideration and a supplemental motion for reconsideration. Murray sought reconsideration of the court's order denying suppression of the evidence that the police developed after leaving the Mush Inn. Judge Souter invited a response from the State and the State opposed the motion. Judge Souter denied Murray's motion for reconsideration.

Murray also filed a motion to quash the search warrant and the evidence found after the police executed the warrant. Murray claimed that the search warrant could not stand because the court suppressed Murray's Mush Inn statement and because the remaining evidence was not sufficient to support the issuance of the warrant. Judge Souter denied that motion.

The case was reassigned to Superior Court Judge Larry D. Card and the parties agreed to a bench trial. Officers Iverson and Hebbe testified. During trial, Judge Card permitted Murray to raise a suppression claim that he had not raised before trial. In this new claim, Murray contended that he was in custody at Third and Ingra for purposes of *Miranda*, and, because he had not been given any warnings, his statement should be suppressed. Murray testified in support of this suppression claim. Judge Card denied Murray's motion finding that Murray was not in custody at Third and Ingra and his statement was voluntary. At the conclusion of the trial, Judge Card found Murray guilty on all counts.

When Murray appeared before Judge Card for sentencing, the State conceded that

---

5. AS 11.61.200(a)(1).

the two counts of third-degree misconduct involving weapons should merge for sentencing purposes. Ultimately, Judge Card dismissed one count and entered conviction on the remaining count.

Murray was a second felony offender for purposes of presumptive sentencing. Judge Card imposed the presumptive 4–year term for second-degree misconduct involving weapons.[6] Judge Card imposed 2–year presumptive terms on the remaining counts.[7] The sentences in all counts were imposed concurrently.

### Discussion

*Did the police violate the Fourth Amendment when they entered Murray's motel room?*

■■ Murray claims that the police violated his Fourth Amendment rights when they entered Room 222. Murray argues that Judge Souter's finding that he consented to this entry was erroneous. Whether a defendant consented to a search is a question of fact to be determined by the trial court from the totality of the circumstances in each case.[8] We must accept the superior court's findings on consent unless they are clearly erroneous.[9]

After an evidentiary hearing, Judge Souter found that the police responded to the report of a dead body in Room 222 and knocked at the entry to the room. Judge Souter found that Murray tacitly consented to the police entry and ratified his consent when they were a few feet in the room. We have examined the record and conclude that substantial evidence supports Judge Souter's findings. Therefore, his conclusion that Murray consented to the entry and search of Room 222 is not clearly erroneous.

*Was Murray in custody when questioned by the police at Third and Ingra and were his statements voluntary?*

■■ Murray argues that the superior court should have suppressed statements he made at Third and Ingra because he was subjected to custodial interrogation and was not advised of his *Miranda* rights. Murray also argues his statements were involuntary. Judge Card denied this claim during trial.

Judge Card considered the factors identified in *Hunter v. State*[10] to analyze whether Murray was in custody for purposes of *Miranda.*[11] Judge Card found that Murray went on his own to Third and Ingra to try to get his Blazer back. The officers and Murray talked in the street in front of Murray's other vehicle in a non-threatening, conversational tone. The officers imposed no restraint on Murray. Murray was not mistreated nor deprived of anything. When the officers discussed the marijuana with Murray, he did not attempt to leave or stop the discussion. After the discussion at Third and Ingra, Murray left in his vehicle.

Judge Card also found that Murray was experienced in the criminal justice system because he had an earlier felony conviction. He understood his rights because he asked for a lawyer later. There was no evidence that Murray was mentally incompetent or under the influence of alcohol. Judge Card found that Murray appeared to be intelligent and articulate. He also found that Murray was not influenced by his probationary status. These findings support Judge Card's conclusion that Murray was not in custody for purposes of *Miranda.* Judge Card also cited *Aningayou v. State*[12] for the analysis of a statement's voluntariness[13] and decided that Murray's statement was voluntary.

Judge Card's factual findings are supported by substantial evidence in the record. In light of these findings, we agree with

6. *See* AS 12.55.125(d)(1).

7. *See* AS 12.55.125(e)(1).

8. *See Phillips v. State,* 625 P.2d 816, 817 (Alaska 1980).

9. *See Brown v. State,* 684 P.2d 874, 880 (Alaska App.1984).

10. 590 P.2d 888 (Alaska 1979).

11. *See id.* at 895.

12. 949 P.2d 963 (Alaska App.1997).

13. *Id.* at 966–67.

Judge Card's conclusion that, under the totality of the circumstances, Murray was not in custody when questioned at Third and Ingra. From our own review of the record, we also agree with Judge Card's conclusion that Murray's statement was voluntary.

### Should evidence obtained after the Miranda violation be suppressed?

Next, Murray argues that the superior court should have suppressed the evidence that the police obtained after the Room 222 *Miranda* violation—Joy's statements to the police, the marijuana that the police found in Murray's Blazer, and Murray's statement to the police at Third and Ingra. Murray claims that the police obtained all this evidence because of the *Miranda* violation.

### Murray's statements at Third and Ingra

■ The State urges us to follow *Oregon v. Elstad*[14] to uphold the superior court's denial of Murray's motion to suppress the Third and Ingra statement. However, this case is distinguishable from *Elstad.* The superior court found that Murray was not in custody at Third and Ingra. Because Murray was not in custody, the police did not need to give him *Miranda* warnings. Therefore, this case does not present the central issue decided in *Elstad*: whether a statement that followed a *Miranda* violation is admissible if the police gave proper *Miranda* warnings before the later statement.[15]

■ Moreover, we conclude that if we apply pre-*Elstad* law, as we did in *Halberg v. State*,[16] any possible taint had dissipated .[17] Under this law, the government first must show that a defendant's later statement was voluntary and, if the defendant was in custody when questioned, that the police advised the defendant of *Miranda* rights that the

defendant freely and voluntarily waived.[18] If the State meets this initial threshold, we examine the totality of the circumstances to decide if the defendant's following statement was "sufficiently an act of free will to purge the primary taint." [19]

■ This analysis requires that we consider a number of factors, including whether *Miranda* warnings were given before the later statement, the time between the initial illegality and the later statement, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct.[20] Other factors that can be considered include the defendant's physical and mental condition at the time of the later statement, whether the defendant remained in custody or was at liberty during this interval, whether the defendant could have contacted a lawyer, family or friends during this interval, whether the later interview took place at a different location, whether the defendant's interrogators were the same officers who committed the prior illegal act, whether the evidence obtained from the prior illegal act affected the defendant's decision to submit to a subsequent interview, whether the police used lies or trickery to influence the defendant's decision, and whether there were other intervening events that affected the defendant's decision.[21] The decision whether a defendant's statement is tainted by a prior illegality is ultimately a question of law that a reviewing court independently determines, accepting the trial court's findings on historical fact unless they are clearly erroneous.[22]

As discussed earlier, Judge Card found that Murray drove to Third and Ingra on his own initiative and left in his own vehicle. He was not mistreated by police and did not try to leave or stop the interview. Murray was

---

14. 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

15. *See id.* at 307–09, 105 S.Ct. 1285.

16. 903 P.2d 1090 (Alaska App.1995).

17. *Id.* at 1097–100.

18. *See id.* at 1094.

19. *Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (quoting *Wong Sun*

*v. U.S.*, 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)); *Halberg*, 903 P.2d at 1094.

20. *See Brown*, 422 U.S. at 603–04, 95 S.Ct. 2254.

21. *See Halberg*, 903 P.2d at 1098.

22. *See Dulier v. State*, 511 P.2d 1058, 1060 (Alaska 1973); *Halberg*, 903 P.2d at 1095.

experienced in the criminal justice system and understood his rights. Judge Souter also found that the police were not trying to "scam" Murray by locating his vehicle. The police asked Murray for consent to search the Blazer and Murray consented without any tricks or pressure from the police.

The questioning at Room 222 did not provide the police with information that directly inculpated Murray in a potential new offense. Murray admitted that he had consumed cocaine supplied by Joy, but, as the record below indicates, the officers expected that they were looking at a potential cocaine case against Joy, whom the police thought was a drug addict. Judge Souter found that Murray believed that "things were going his way . . . . [and] that he believed in his own mind that whatever the police found in his car, because the police were helping him out at this point, that that would get attributed to the other people in the car."

After stopping the Blazer, the police talked to Joy about Murray's cocaine allegations. Joy raised the subject of marijuana and told the police where it was in the Blazer. Joy told the officers that Murray had given her the marijuana to sell and that Murray operated marijuana grows and had marijuana and a handgun at his home. The officers asked Murray about these new disclosures. Murray denied operating marijuana grows but admitted the other allegations.

The facts support the court's conclusion that Murray's statement was sufficiently insulated from the *Miranda* violation to escape its taint. After the officers left, Murray at the Mush Inn, he was at liberty and could contact anyone he wished. The questioning by the same police who were at Room 222 occurred on the street in front of Murray's truck. Murray could have left at any time. The topic of discussion, marijuana, was new. The police did not trick Murray or lie to him. To the extent that Murray's statements in Room 222 were inculpatory, they did not incriminate Murray on the criminal charges

that he ultimately faced. When the officers limited Murray's freedom they were investigating the report of a dead body and were trying to find out from Murray why he would be subjected to an apparent hoax. After the discussion in Room 222 was over, the officers left to help recover Murray's Blazer.

Based on these facts, it does not appear that Murray's statements at Third and Ingra were significantly influenced by his questioning in Room 222. He did not "let the cat out of the bag" in the first interview because he never said anything about marijuana or the handgun.[23] Instead, he related the problems he had with Joy around cocaine. Examining the totality of the circumstances, we conclude that there was a break in the "stream of events ... sufficient to insulate the [later] statement from the effect of all that went before."[24] Thus, the superior court did not err when it denied Murray's motion to suppress his statement at Third and Ingra as derivative evidence of the *Miranda* violation.

*Joy's statements and the marijuana in the Blazer*

■ The police learned of Joy's identity and the fact that she was driving Murray's Blazer during the questioning in Room 222 that Judge Souter suppressed. Joy did not testify at trial nor were Joy's statements admitted as substantive evidence.

The police used the information they learned from Joy to question Murray at Third and Ingra. Murray's statements from that interview—that the marijuana found in the Blazer was his and that he had marijuana and a handgun at his home—were admitted at trial.

Even if we apply pre-*Elstad* law as we did in *Halberg*, Joy's statements are sufficiently insulated from the *Miranda* violation to be free of its taint. The police were looking for the Blazer to help Murray recover it. Murray gave the police information that led them

---

**23.** *See United States v. Bayer*, 331 U.S. 532, 540–41, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947) (describing the "cat-out-of-the-bag" circumstance as a situation where a defendant, having once confessed through application of unlawful police procedures, may be operating under coercive

pressure of the original confession in a later statement).

**24.** *Clewis v. Texas*, 386 U.S. 707, 710, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967).

to believe that they might have a cocaine-related case against Joy. When the police stopped the Blazer, Joy provided new information that led the police to the marijuana in the Blazer. Joy also told the police about the marijuana and the handgun at Murray's house. Although Murray argues on appeal that Joy was coerced and induced to speak to the officers, this claim finds no support in the record and was not raised in the superior court.

The police were acting to help Murray when they stopped the Blazer. The topics that Joy raised—the marijuana, where the marijuana could be found, and the handgun at Murray's house—were topics that Murray did not mention in the suppressed statement in Room 222. As we discussed above, the police questioned Murray in Room 222 because they were sent there on a reported death. When their initial contact with Murray was over, they left to help him recover his Blazer.

Evaluating the totality of the circumstances, we conclude that the police did not exploit the *Miranda* violation to obtain Joy's statements and there was a sufficient break between the *Miranda* violation and Joy's statements to insulate this evidence from any taint.

We conclude that this same analysis applies to the marijuana recovered from Murray's Blazer. The police did not know of the marijuana when they talked with Murray in Room 222. They learned of the existence and location of the marijuana from Joy. The police did not exploit the *Miranda* violation to seize the marijuana. Again we conclude there was a sufficient break between the *Miranda* violation and the seizure of the marijuana in the Blazer to insulate this evidence from the taint of the *Miranda* violation.

Finally, Murray argues that we should apply a presumption of taint whenever evidence is obtained by the government after a *Miranda* violation. But procedurally no addi-tional presumption of taint is required. As discussed in *Brown* and *Halberg*, the government already must show that if evidence is potentially tainted by an earlier illegality, it must be sufficiently insulated from the taint of the illegality to be admissible.

*Was the search warrant supported by probable cause?*

 In the superior court, Murray attacked the search warrant by claiming that Joy's hearsay statements to the police were not adequately corroborated under *Aguilar–Spinelli*[25] and that Murray's suppressed statement was used in the application for the warrant. The State opposed Murray's motion by pointing out that Murray's admissions at Third and Ingra were also presented to the magistrate and themselves established probable cause to search Murray's residence. The superior court denied Murray's motion.

In this appeal, Murray abandons his *Aguilar–Spinelli* claim and raises a new attack on the search warrant. Murray now argues that Murray's statement from Third and Ingra, Joy's hearsay statement, and the evidence of the marijuana found in his Blazer should be excised from an analysis of the warrant because they are fruits of the Room 222 *Miranda* violation.

Murray argues that if all the derivative evidence that he identifies is excised from the application, the remaining evidence is not sufficient to support the search warrant. But Murray did not make this argument in the superior court. Because Murray did not make this argument in the superior court, it was not preserved.[26]

Furthermore, as we decided above, Murray's Third and Ingra statement, Joy's statement, and the marijuana found in the car were not tainted by the *Miranda* violation in Room 222. We conclude from our review of the record that the search warrant was supported by probable cause.

**25.** *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

**26.** *See Moreau v. State,* 588 P.2d 275, 279–80 (Alaska 1978) (search and seizure claims ordinarily cannot be raised for the first time on appeal because such errors do not affect the fundamental fairness of the fact-finding process).

*Did the State present sufficient evidence to support the conviction for fourth-degree misconduct involving controlled substances?*

 Murray argues that insufficient evidence supports his conviction for fourth-degree misconduct involving controlled substances—maintaining a place used for keeping or distributing controlled substances.[27] Murray argues—as he did in the superior court—that there was insufficient evidence indicating that his residence was used continuously for possession or distribution of marijuana. Murray also claims that there was no connection made between the nearly six ounces of marijuana found in the living room closet, the marijuana residue found in his bedroom drawer, and a "screening tin" police found in the kitchen. Murray suggests that these residues could have been from personal use of marijuana.

The State argues that Judge Card made a fair inference of continuity from the fact that a screening tin and a gram scale were found at Murray's residence. The State further argues that continuity is also fairly inferred from the handgun that was found in its case with a bud of marijuana. According to the State, the handgun is "another badge of a person who deals in drugs," particularly since marijuana was located in its case.

In *Dawson v. State*,[28] this court interpreted AS 11.71.040(a)(5) and held that the words "keep" and "maintain" in the statute require the State to demonstrate continuity or duration, rather than an isolated incident of possession or distribution.[29] We stated as follows:

> [T]o establish a violation of AS 11.71.040(a)(5), the state must prove that the accused, while knowingly controlling or knowingly having authority to control property of the type listed in the statute, personally used the property or knowingly permitted another to use it for the purpose of keeping or distributing prohibited controlled substances in a manner that amounts to a felony under Alaska law.

The state need not prove that the property was used for the exclusive purpose of keeping or distributing controlled substances, but such use must be a substantial purpose of the users of the property, and the use must be continuous to some degree; incidental use of the property for keeping or distributing drugs or a single, isolated occurrence of drug-related activity will not suffice. The purpose with which a person uses property and whether such use is continuous are issues of fact to be decided on the totality of the evidence in each case; *the state is not required to prove more than a single specific incident involving the keeping or distribution of drugs if other evidence of continuity exists.*[30]

As to the first element outlined in *Dawson* (that Murray knowingly controlled or knowingly had the authority to control the type of property listed in the statute), Judge Card found that utility and other bills located on a table in the home were Murray's bills, indicating that it was his residence, "not a place he just happened to be in for a night or two." As to the second element outlined in *Dawson* (that Murray used the property for the purpose of keeping or distributing prohibited controlled substances in a manner amounting to a felony), Judge Card found that Murray had violated AS 11.71.040(a)(1) by possessing marijuana with the intent to deliver. However, Judge Card found that there was not sufficient evidence to indicate that Murray permitted another person to conduct business from his home. As to the third element outlined in *Dawson* (that the use of the residence for such purpose was continuous to some degree, not merely incidental nor a single, isolated occurrence of drug-related activity), Judge Card found that the nearly six ounces of marijuana found in the living room closet was a "substantial amount of marijuana." Judge Card also discussed the fact that marijuana was found throughout the house. Judge Card further found that "Murray was readily willing to transfer, deliver,

---

**27.** AS 11.71.040(a)(5).

**28.** 894 P.2d 672 (Alaska App.1995).

**29.** *Id.* at 676.

**30.** *Id.* at 678–79 (emphasis added).

[and] give" the marijuana to others, and had in fact given marijuana to Joy.

Given these findings and the evidence in this case, we conclude that a fair-minded fact-finder could conclude that the State proved this charge beyond a reasonable doubt.[31]

### Sufficiency of evidence for second-degree weapons misconduct

■ Murray also moved for a judgment of acquittal on second-degree weapons misconduct—possession of a firearm during the commission of a felony drug offense—arguing that the State presented insufficient evidence to demonstrate a connection between his alleged drug offense and the possession of a firearm. Murray argued that the offense charged requires "some active use or deployment of the firearm with [and] in conjunction with the drug felony offense." Judge Card denied the motion for acquittal and convicted Murray on this count.

Alaska Statute 11.61.195(a)(1) provides that "[a] person commits the crime of misconduct involving weapons in the second degree if the person knowingly . . . possesses a firearm during the commission of an offense under AS 11.71.010—11.71.040[.]" Murray argues that under this court's decision in Collins v. State,[32] the State did not prove a sufficient nexus between Murray's possession of a firearm and his commission of a felony drug offense. We issued the Collins opinion after Murray's bench trial.

In Collins, the evidence suggested that the defendant dealt drugs in a residence where firearms were found.[33] We held that "AS 11.61.195(a)(1) requires proof of a nexus between a defendant's possession of the firearm and the defendant's commission of the felony drug offense."[34] Even though we assumed that the State presented enough evidence at Collins's trial to prove that nexus, we concluded that Collins's conviction was flawed because the trial jury was not instructed on

the nexus requirement, and, therefore, did not find that the State proved this element.[35]

Murray argues that the State offered no independent proof of when the firearm was obtained or why. This, Murray argues, left the State with only the bare seizures of the marijuana and the gun from the same house with no evidence that the firearm had any relation to the six ounces of marijuana in the house. Murray also points to the fact that the marijuana was in the living room closet, while the firearm was in a bedroom drawer.

However, the police also found a marijuana bud in the case with the handgun. The State argues that the presence of the marijuana in the gun case is strong evidence of a connection between Murray's drug offense and possession of the gun. Furthermore, the State points out that Judge Card found a connection between Murray's possession of the handgun and a felony drug offense. Judge Card found that:

> [I]n this case, the place where the drugs were located was also the place where the firearm was located. It's not like the firearm was here in Anchorage and the drugs were in Kenai or Denali or in the back of a car. And so there was a logical correlation, [despite] the statements that there had been . . . a burglary[.] One stash of marijuana is a valuable item, and people have been known to break into homes and places where they are kept; . . . committing robberies, committing murders to get those drugs . . . and any money. So, the firearm was a necessary component. And since it was knowingly possessed, based on the statements of Mr. Murray, and it was during the commission of a felony drug offense as found in Count I and Count II, the defendant is hereby guilty of Count III of knowingly possessing a firearm during the commission of a felony drug offense.

However, Judge Card did not have the benefit of the Collins decision when he entered his findings. It does not appear from our review of Judge Card's findings that he dis-

**31.** See Dorman v. State, 622 P.2d 448, 453 (Alaska 1981).

**32.** 977 P.2d 741 (Alaska App.1999).

**33.** Id. at 752.

**34.** Id. at 753.

**35.** See id. at 752–53.

cussed whether the State had proved the nexus that we discussed in *Collins*. Judge Card was the sole fact-finder in Murray's non-jury trial. Therefore, we will remand the case to Judge Card for him to address whether the State proved the nexus element discussed in *Collins*.

*Conclusion*

Murray's conviction for second-degree misconduct involving weapons (possession of a firearm during the commission of a felony drug offense) is VACATED and the case is REMANDED for further consideration of that count. In all other respects, the judgment of the superior court is AFFIRMED.

Judge Card shall enter supplemental findings on the charge of second-degree misconduct involving weapons. If Judge Card again concludes that Murray is guilty of this charge, he shall transmit his findings to this court within seventy-five days. Murray shall have thirty days from the transmission of those findings to submit a supplemental memorandum addressing Judge Card's decision. The State shall then have thirty days to submit its supplemental memorandum. Finally, Murray shall have twenty days to submit a reply memorandum. However, if Judge Card finds that the State did not prove this charge in light of *Collins*, he shall notify this court directly. We retain jurisdiction.