Phillip A. CRAWFORD, Appellant,

v.

STATE of Alaska, Appellee.

No. A–8459.

Court of Appeals of Alaska.

Oct. 22, 2004.

Marcia E. Holland, Assistant Public Defender, Fairbanks, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

W.H. Hawley, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

In this appeal, we must assess the potential curative effect of *Miranda* warnings that were administered to a suspect in police custody after the police had already unlawfully obtained incriminating statements from the suspect in violation of *Miranda* (by interrogating him without giving him the required warnings).[1]

In our last major decision on this subject, *Halberg v. State*, 903 P.2d 1090 (Alaska App. 1995), we described two competing analyses of this question: the older "dissipation of

taint" analysis exemplified by the United States Supreme Court's decision in *Brown v. Illinois*,[2] and the modified analysis announced in 1985 by the Supreme Court in *Oregon v. Elstad*.[3]

Under *Brown*, even though a suspect ultimately receives proper *Miranda* warnings, the statements that the suspect makes after receiving those *Miranda* warnings are still presumptively inadmissible; to rebut this presumption, the government must show that there was a "break in the chain of events" to insulate those later statements from the taint of the suspect's initial unwarned admissions.[4] But under *Elstad*, the later administration of *Miranda* warnings presumptively negates the psychological pressures of custodial interrogation from that point forward, thus rendering the suspect's ensuing statements admissible despite the fact that the suspect had earlier made incriminating admissions. In the words of the *Elstad* Court, "a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the [earlier] unwarned statement inadmissible", even when there has been no significant break in the stream of events as required under *Brown*.[5]

In *Halberg*, we were asked to reject the *Elstad* rule and to adopt the *Brown* rule as a matter of state constitutional law. However, we ultimately concluded that there was no need to decide that issue, since the defendant's post-*Miranda*-warning statements were untainted even under the *Brown* rule.[6]

In the present appeal, we are once more faced with this issue. We again conclude that we need not decide the issue—this time, because the defendant's statements should be suppressed even under the *Elstad* rule.

### Underlying facts

Phillip A. Crawford was convicted of possession of cocaine (fourth-degree misconduct

---

1. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975).

3. 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

4. *Brown*, 422 U.S. at 611, 95 S.Ct. at 2265.

5. *Elstad*, 470 U.S. at 310–11, 105 S.Ct. at 1294.

6. *Halberg*, 903 P.2d at 1097–1100.

involving a controlled substance) after the police found cocaine under the seat of his car. The police found the cocaine after Crawford told them where the drug was and gave them permission to search his vehicle. However, Crawford made his initial admission about the cocaine when he was subjected to custodial interrogation without the benefit of *Miranda* warnings.

Alaska State Troopers George Kammer and Justin Lindell (a probationary recruit) stopped Crawford's car because his registration tags were expired. Trooper Lindell approached Crawford's car and identified himself. During his conversation with Crawford, Lindell smelled alcohol on Crawford's breath. Lindell asked Crawford if he had been drinking. Crawford denied having had anything to drink that day, but he admitted drinking the night before.

Lindell then asked Crawford if he had any alcohol, weapons, or drugs in the car, and if he would consent to a search of his vehicle. Crawford denied having any contraband, but he consented to the search of his car.

After further questioning, Crawford admitted that he had failed to register the car after he purchased it. Crawford also admitted that his driver's license was revoked. After a computer check confirmed that Crawford's driver's license was revoked, Lindell informed Crawford that he was under arrest for driving with a revoked license, and Lindell handcuffed Crawford's hands behind his back. The parties agree that, as of that moment, Crawford was in custody for *Miranda* purposes.

Following this arrest, Lindell conducted a pat-down search of Crawford's person. During this pat-down, Lindell discovered what seemed to be a small smoking pipe in Crawford's right front pocket. When Lindell asked for permission to remove the pipe, Crawford consented. The pipe gave off the odor of burnt marijuana.

Lindell then asked Crawford if he had anything else in his pockets. Crawford admitted that there was a little can of marijuana in his pocket. Trooper Lindell retrieved the can and confirmed that it contained marijuana.

Trooper Lindell then asked Crawford if he had any more drugs in his vehicle. Crawford admitted that he had some more marijuana and a couple of grams of cocaine under the seat of his car.

At this point, Lindell took Crawford back to the patrol car and, for the first time, advised him of his *Miranda* rights. Crawford waived his *Miranda* rights and agreed to further questioning.

Lindell began this post-*Miranda* questioning by reminding Crawford of the things he had previously admitted—in particular, his possession of marijuana and cocaine under the seat of his car. (The tape of this interview shows that Lindell said to Crawford, "Like we were talking about before, you had said you had coke under the seat. Is it okay to look in the car, under the seat?") Lindell then questioned Crawford about the cocaine. And, after reminding Crawford that he had already consented to a search of his car, Lindell again asked Crawford for permission to search the car. Crawford again consented. Lindell then entered the car and found a bag of cocaine and a can of marijuana under the driver's seat.

After the grand jury indicted Crawford for possession of cocaine, Crawford asked the superior court to suppress the statements that he made to Trooper Lindell. Crawford argued that his initial statements were elicited through interrogation while he was in custody but before he had been given his *Miranda* warnings, and that his post-*Miranda* statements were tainted because they were not sufficiently insulated from the initial *Miranda* violation.

Superior Court Judge Ralph R. Beistline granted Crawford's suppression motion in part. He suppressed the statements that Crawford made prior to receiving *Miranda* warnings, but he ruled that Crawford's later statements (the statements he made after he received *Miranda* warnings) were admissible.

Judge Beistline based his ruling on the United State Supreme Court's decision in *Oregon v. Elstad.* He reasoned that even though Crawford's pre-*Miranda* statements should be suppressed, Crawford's post-*Mi*-

*randa* statements were nonetheless admissible because these statements were voluntary and because Crawford knew, at that point, that he had the right to remain silent and to refuse to answer the trooper's questions.

In the alternative, Judge Beistline ruled that Crawford's post-*Miranda* statements would be admissible even under pre-*Elstad* law. The judge concluded that Crawford's post-*Miranda* statements were untainted by the *Miranda* violation because he found that, under the totality of the circumstances, Crawford freely and voluntarily provided those statements.

At Crawford's trial, the State relied on Crawford's post-*Miranda* statements to help prove that he was aware of the cocaine under the seat of his car. The jury convicted Crawford of possessing cocaine (fourth-degree misconduct involving a controlled substance).

■ In this appeal, Crawford argues that Judge Beistline should have suppressed his post-*Miranda* statements. He asks this Court to adopt the *Brown* rule as a matter of state constitutional law, and he argues that, under the *Brown* rule, his post-*Miranda* statements were the tainted fruit of the earlier *Miranda* violation. In the alternative, Crawford argues that his later statements should be suppressed even under the rule announced in *Oregon v. Elstad.* The State, for its part, argues that Crawford's post-*Miranda* statements are admissible under both *Brown* and *Elstad.*

■ Appellate courts generally should decline to reach constitutional issues if the case can be resolved on non-constitutional grounds.[7] Thus, before we decide whether to endorse or reject the *Elstad* rule as a matter of Alaska constitutional law, we must first examine the admissibility of Crawford's statements under both pre-*Elstad* law and post-*Elstad* law—for if Crawford's statements would be admissible or inadmissible under both analyses, there would be no need for us to decide whether to endorse or reject the *Elstad* rule.

*The admissibility of Crawford's statements under the law as it existed before Oregon v. Elstad*

As we explained in *Halberg v. State,* there are two basic ways in which the police may violate a defendant's privilege against self-incrimination:

First, the police may use interrogation methods so coercive as to "overbear [the suspect's] will to resist and bring about confessions not fairly self-determined". *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961). In such cases, the defendant's confession is deemed involuntary, and it must be suppressed. Second, the police may violate the rules established in *Miranda* and succeeding cases—the rules governing the police's duty to inform an arrested suspect of the rights to silence and to counsel, to obtain a waiver of these rights before custodial interrogation, and to respect a suspect's invocation of these rights. Even if the defendant's statement is voluntary, the *Miranda* violation constitutes an independent ground for suppression.

*Halberg,* 903 P.2d at 1093.

Before the United States Supreme Court decided *Oregon v. Elstad,* courts used one legal test to analyze whether a previous Fifth Amendment violation—either an involuntary statement or a statement taken in violation of *Miranda*—tainted a defendant's later statement. As a preliminary matter, the government had to show that the defendant's later statement was voluntary and, if the defendant was in custody during the subsequent interrogation, that the defendant received proper *Miranda* warnings and waived those rights. Assuming that these foundational matters were proved, the remaining question was whether, under the totality of the cir-

---

7. *See, e.g., Municipality of Anchorage v. Anchorage Daily News,* 794 P.2d 584, 594 n. 18 (Alaska 1990); *State v. F/V Baranof,* 677 P.2d 1245, 1255 (Alaska 1984); *Puller v. Anchorage,* 574 P.2d 1285, 1288 (Alaska 1978); *Perry v. State,* 429 P.2d 249, 251–52 (Alaska 1967). *See also Escambia County v. McMillan,* 466 U.S. 48, 51, 104 S.Ct. 1577, 1579, 80 L.Ed.2d 36 (1984), where the United States Supreme Court declared, "It is a well established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case."

cumstances, the defendant's decision to give a subsequent statement was "sufficiently an act of free will to purge the primary taint". *Brown v. Illinois*, 422 U.S. at 602, 95 S.Ct. at 2261. Or, as the Supreme Court stated in *Clewis v. Texas*, the question was whether there was a "break in the stream of events ... sufficient to insulate the [subsequent] statement from the effect of all that went before".[8]

(*Brown* involved a claim that the defendant's statement was tainted by his prior illegal arrest (a Fourth Amendment violation). However, the Supreme Court required the same analysis in cases involving violations of the Fifth Amendment. *See Westover v. United States* (a companion case of *Miranda* ),[9] and *Clewis v. Texas*.[10] *See also United States v. Bayer*, 331 U.S. 532, 540, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654 (1947); *Holland v. McGinnis*, 963 F.2d 1044, 1050 (7th Cir.1992); and *United States v. Wauneka*, 770 F.2d 1434, 1441 (9th Cir.1985) (discussing other cases involving prior involuntary confessions).)

The *Brown* case is particularly important because, in *Brown,* the government argued that the taint of a prior illegality could always be negated by giving the defendant *Miranda* warnings. The government asserted that, once a defendant understood that they did not need to say anything to the police, any knowing and voluntary decision to submit to questioning necessarily constituted an independent act of will that broke the "stream of events". The Supreme Court rejected the government's argument:

[The fact that the defendant received] *Miranda* warnings [before making the subsequent statement is] an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But [this is] not the only factor to be considered. The temporal proximity of the [initial illegality] and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant.

*Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62 (footnotes and citations omitted).

The decision whether a defendant's statements are tainted by a prior illegality is ultimately a question of law. As an appellate court, we must accept the trial court's findings of historical fact (unless they are shown to be clearly erroneous). But we then independently determine whether, under those facts, the defendant's decision to speak with the police was voluntary and sufficiently insulated from the prior illegality to escape its taint. *Dulier v. State*, 511 P.2d 1058, 1060 (Alaska 1973).[11]

In *Halberg,* we discussed the factors that a court should consider when determining whether, under the totality of the circumstances, a defendant's subsequent statements should be deemed the tainted fruit of prior illegally obtained statements. We listed these factors:

the purpose and flagrancy of the initial illegal act, the amount of time between the illegal act and the defendant's subsequent statement, the defendant's physical and mental condition at the time of the subsequent statement, whether the defendant remained in custody or was at liberty during this interval, whether the defendant had the opportunity to contact legal counsel or friends during this interval, whether the subsequent interview took place at a different location, whether the defendant's interrogators were the same officers who committed the prior illegal act, whether the evidence obtained from the prior illegal act affected the defendant's decision to submit to a subsequent interview, whether the police used lies or trickery to influence the defendant's decision, and whether

8. 386 U.S. 707, 710, 87 S.Ct. 1338, 1340, 18 L.Ed.2d 423 (1967).

9. 384 U.S. 436, 494–96, 86 S.Ct. 1602, 1638–39, 16 L.Ed.2d 694 (1966).

10. 386 U.S. at 710–11, 87 S.Ct. at 1340.

11. *Accord, United States v. Robinson*, 20 F.3d 320, 322 (8th Cir.1994); *Holland v. McGinnis*, 963 F.2d 1044, 1050 (7th Cir.1992); *United States v. Anderson*, 929 F.2d 96, 99 (2nd Cir. 1991); *United States v. Lewis*, 833 F.2d 1380, 1384 (9th Cir.1987).

there were other intervening events that affected the defendant's decision.

*Halberg,* 903 P.2d at 1098.

■ Concerning the first factor mentioned above—the "purpose and flagrancy of the initial illegal act"—the State presented testimony that Trooper Lindell acted from inexperience and excitement when, after arresting Crawford, he began to question Crawford without first giving him *Miranda* warnings. That is, the State suggested that Lindell did not purposefully refrain from administering *Miranda* warnings to Crawford, but rather simply forgot to give Crawford prompt *Miranda* warnings. Judge Beistline made no finding on this issue of fact. We note, however, that police forgetfulness or inexperience is not recognized as an excuse for failing to give *Miranda* warnings to a suspect in custody before interrogation begins.

There may be instances when the police fail to administer *Miranda* warnings because the officers reasonably but mistakenly believe that the suspect is not in custody. Or there may be instances (such as the one presented in *Halberg* ) when the police make a good-faith effort to administer the *Miranda* warnings, but either the warnings or the suspect's ensuing waiver of rights turns out to be deficient in some respect. But in Crawford's case, Lindell formally placed Crawford under arrest before the challenged interrogation began, and Lindell made no attempt to administer *Miranda* warnings to Crawford following this arrest until after Crawford admitted that there was cocaine beneath the seat of the car.

Judge Beistline did find that there was "no coercion or intention by [the] troopers to extract or even encourage a confession" from Crawford. And with regard to lack of coercion, Judge Beistline's finding is supported by the record. But Judge Beistline's finding that the troopers had no intention "to extract or even encourage a confession" is clearly erroneous. Before Lindell administered the *Miranda* warnings to Crawford, Lindell repeatedly asked Crawford to tell him whether there were drugs in the car. And, after the *Miranda* warnings were administered, Lindell expressly reminded Crawford of his ear-

lier admissions and encouraged him to repeat or affirm them.

The interval between Crawford's initial statements obtained through the *Miranda* violation and Crawford's subsequent post-*Miranda* statements could hardly have been shorter. Judge Beistline found that the troopers administered the *Miranda* warnings to Crawford "mere minutes after his initial statements." Further, Crawford remained in custody throughout this time; he had no opportunity to reflect, much less to obtain legal assistance or contact friends. Moreover, the troopers' continued questioning of Crawford was conducted at the same location by the same officer who obtained Crawford's initial statements in violation of *Miranda.*

It is also important to note that, after Trooper Lindell belatedly warned Crawford of his *Miranda* rights, Lindell immediately reminded Crawford of his earlier self-incriminating statement (his admission that there was cocaine under the seat of his car). It therefore appears likely that Crawford's earlier self-incriminating statement, obtained without benefit of *Miranda* warnings, was a significant factor in Crawford's decision to keep answering the trooper's questions and to repeat his earlier admission that he possessed cocaine.

Under these circumstances, analyzing Crawford's case under pre-*Elstad* law, we conclude that Crawford's statements were tainted by the earlier *Miranda* violation and should have been suppressed.

*The admissibility of Crawford's statements under the law since Oregon v. Elstad*

In *Elstad,* the Supreme Court abandoned the *Brown* "dissipation of taint" test for *Miranda* violations. In doing so, the Court drew a distinction between instances in which the police use coercive methods to obtain an involuntary confession from a suspect, and instances in which the suspect's statements are voluntary but are obtained after the police fail to give *Miranda* warnings to the suspect.

■ The Court explained that it was appropriate to use the "dissipation of taint" test in the first category of cases because the

Fifth Amendment bars compelled self-incrimination; thus, the extraction of an involuntary confession is a violation of the suspect's federal constitutional rights. But with regard to the second category of cases, the Court held that it was not appropriate to use the "dissipation of taint" test—because the police can violate the *Miranda* rule without violating the suspect's Fifth Amendment rights:

> [While] [t]he *Miranda* exclusionary rule ... serves the Fifth Amendment[, it] sweeps more broadly than the Fifth Amendment itself. [The *Miranda* rule] may be triggered even in the absence of a Fifth Amendment violation. The Fifth Amendment prohibits use ... only of *compelled* testimony.... [U]nwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda.* Thus, in the individual case, *Miranda's* preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm.

*Elstad,* 470 U.S. at 306–07, 105 S.Ct. at 1291–92 (emphasis in the original).

The Supreme Court held that when the prior police illegality involves only a *Miranda* violation, "a careful and thorough administration of the *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible," even when there has been no identifiable break in the stream of events of the type required under *Brown.*[12] In such cases, the Court declared, the administration of *Miranda* warnings before the subsequent interview "conveys the relevant information [concerning the suspect's constitutional rights to silence and to the assistance of counsel,] and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an act of free will."[13]

At first blush, one might interpret *Elstad* as standing for the proposition that the later administration of *Miranda* warnings negates all that went before—returning the police officers and the suspect in their custody to the legal situation they were in before the *Miranda* violation. But this would be a misreading of *Elstad.*

The *Elstad* decision does firmly reject the notion that, once a suspect has made incriminating admissions, a later administration of *Miranda* warnings can never cure the preceding illegality because, from the suspect's point of view, the "cat is out of the bag" and so there is no point in asserting one's rights. The Oregon court had relied heavily on this "cat out of the bag" doctrine when it ruled that Elstad's post-*Miranda* statements had to be suppressed. The Supreme Court disagreed:

> [T]he causal connection between any psychological disadvantage created by [the suspect's] admission [at the time of his arrest] and his ultimate decision to cooperate [with the authorities] is speculative and attenuated at best. It is difficult to tell with certainty what motivates a suspect to speak.... [A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion.

*Elstad,* 470 U.S. at 313–14, 105 S.Ct. at 1295–96.

In other words, *Elstad* holds that once *Miranda* warnings are given, and the suspect understands that they have a right not to answer police questions, the courts will not presume that the suspect's prior unwarned admissions were the factor that caused the suspect to waive their constitutional rights and make further statements to the police. In fact, the presumption is the opposite: once *Miranda* warnings have been given, thus apprising the suspect of the constitutional rights to silence and to the assistance of counsel, "the suspect's choice whether to exercise his privilege to remain silent should

---

12. *Elstad,* 470 U.S. at 310–12, 105 S.Ct. at 1293–94.

13. *Id.,* 470 U.S. at 311, 105 S.Ct. at 1294, quoting *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963) (internal quotations omitted).

[thereafter] ordinarily be viewed as an act of free will".[14]

But the Supreme Court used the adverb "ordinarily" in the preceding sentence for a reason. *Elstad* acknowledges that there may be instances in which defendants can show that, despite receiving *Miranda* warnings, they were nevertheless illegally pressured to continue speaking—instances in which the police "exploit the [earlier] unwarned admission to pressure [the defendant] into waiving his [or her] right to remain silent".[15]

In the twenty years since *Elstad* was decided, several courts have pointed to this aspect of the *Elstad* decision and have interpreted *Elstad* as recognizing an "exploitation" exception to the general rule that "a careful and thorough administration of the *Miranda* warnings" will insulate a suspect's ensuing statements from a prior *Miranda* violation. Thus, courts that apply the *Elstad* rule occasionally hold that the administration of *Miranda* warnings was insufficient to salvage the admissibility of the suspect's ensuing statements—because, under the facts of the particular case, the police improperly exploited the suspect's prior unwarned admission.[16]

Indeed, the United States Supreme Court's recent decision in *Missouri v. Seibert*, 542 U.S. ——, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), can be viewed as a further development of *Elstad's* "exploitation" exception.

The defendant in *Seibert* conspired to burn down her house and, in the process, kill a mentally ill teenager who was living with her family.[17] Five days after the arson and homicide, the police arrested Seibert, but they did not read her her *Miranda* rights.

At the police station, a police officer questioned Seibert for 30 to 40 minutes. During this interrogation, Seibert confessed that the plan was for the teenager to die in the fire. The officer then broke off questioning for 20 minutes. At the end of this 20-minute break, he returned and gave Seibert her *Miranda* warnings, whereupon Seibert waived her rights in writing. The officer then resumed his questioning, confronting Seibert with her earlier unwarned admissions and getting her to repeat this information.[18]

The police officer later testified that he had been trained (apparently in reliance on the *Elstad* decision) to withhold *Miranda* warnings until a suspect had made as many incriminating statements as possible, and then to administer *Miranda* warnings and have the suspect repeat all of these prior admissions.[19]

A plurality of the Supreme Court[20] held that the *Miranda* warnings given to Seibert were ineffective, and thus Seibert's statements had to be suppressed, because the *Miranda* warnings were not "given under circumstances allowing for a real choice between talking and remaining silent".[21] The plurality explained:

> [The] *Miranda* [decision] addressed "interrogation practices ... likely ... to disable [an individual] from making a free and rational choice" about speaking.... [*Miranda*] held that a suspect must be "adequately and effectively" advised of the choice the Constitution guarantees.... The object of [the] question-first[, warn-later approach adopted by the police in this case] is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed.

---

14. *Id.*, 470 U.S. at 311, 105 S.Ct. at 1294 (internal quotations omitted).

15. *Id.*, 470 U.S. at 316, 105 S.Ct. at 1296 (quoted in *Halberg*, 903 P.2d at 1097).

16. Compare *Ramírez v. State*, 739 So.2d 568 (Fla. 1999), with *Davis v. State*, 859 So.2d 465 (Fla. 2003). See *State v. Bailey*, 677 N.W.2d 380, 392 (Minn.2004); *Jones v. State*, 119 S.W.3d 766, 771–76 (Tex.Crim.App.2003) (*en banc*); *Davis v. United States*, 724 A.2d 1163 (D.C.App.1998); *United States v. Anderson*, 929 F.2d 96, 102 (2nd

Cir.1991); *United States v. Carter*, 884 F.2d 368 (8th Cir.1989).

17. *Seibert*, 124 S.Ct. at 2602.

18. *Id.*

19. *Id.* at 2606.

20. Justice Souter wrote the plurality opinion, joined by Justices Stevens, Ginsburg, and Breyer.

21. *Seibert*, 124 S.Ct. at 2608.

Just as "no talismanic incantation [is] required to satisfy [*Miranda's*] strictures," . . . it would be absurd to think that mere recitation of the litany suffices to satisfy *Miranda* in every conceivable circumstance. "The inquiry is simply whether the warnings reasonably conve[y] to [a suspect] his rights as required by *Miranda*." . . . The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

*Seibert*, 124 S.Ct. at 2609–2610 (citations and some internal quotations omitted).

 The *Seibert* plurality stated that because *Elstad* had withdrawn most *Miranda* cases from a traditional "taint" analysis, the question to be asked in cases such as Seibert's is "whether[,] in the circumstances[,] the *Miranda* warnings given [to the suspect] could reasonably be found effective". If not, then "the [suspect's] subsequent statement is inadmissible for want of adequate *Miranda* warnings".[22] The plurality noted that

when *Miranda* warnings are inserted in the midst of a coordinated and continuing interrogation, they are likely to mislead [a suspect] and deprive a [suspect] of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.

*Seibert*, 124 S.Ct. at 2611 (internal quotations omitted). The *Miranda* warnings become misleading when they are inserted midstream in an essentially uninterrupted interrogation because

telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement [that the suspect has] just given, could lead [the suspect] to an entirely reasonable inference that what he [had] just said [to the police before the *Miranda* warnings were administered] *will* be used [against him], with subsequent silence being of no avail.

*Seibert*, 124 S.Ct. at 2611 (emphasis added).

In other words, the interrogation in *Seibert* was structured in such a way that, in the words of the *Elstad* decision, the police were able to "exploit the [earlier] unwarned admission[s] to pressure [the defendant] into waiving [her] right to remain silent".

This is not to say that the *Seibert* plurality relied on the fact that the police officer consciously structured the interrogation in this manner. Both the *Seibert* plurality and the four dissenters[23] disavowed any reliance on the police officer's subjective purpose—for, as Justice O'Connor noted in her dissent, the Supreme Court's *Miranda* cases have uniformly adopted the position that "[t]houghts kept inside a police officer's head cannot affect [a suspect's] experience [of the interrogation]".[24]

---

22. *Id.* at 2610 n. 4.

23. Justice O'Connor, joined by Chief Justice Rehnquist and Justices Scalia and Thomas.

24. *Id.* at 2617. Only Justice Kennedy based his decision on the police officer's subjective intent to use *Elstad* in a way that would circumvent *Miranda*. *Id.* at 2614–16. Justice Breyer, writing separately, stated that he would recognize a "good-faith" exception to the rule advocated by the plurality. *Id.* at 2613–14. But Justice Breyer joined the plurality opinion, and the plurality opinion expressly disavows any inquiry into the interrogating officer's subjective intention. *See id.* at 2612 n. 6. Instead, the plurality opinion repeatedly refers to an "objective measure" of the circumstances. *See id.* at 2610, 2612. Moreover, the plurality opinion characterizes the facts of *Elstad* as an example of "a good-faith *Miranda* mistake", *id.* at 2612, a situation in which "the officer's initial failure to warn . . . may have been the result of confusion as to whether the brief exchange [between the officer and the defendant] qualified as 'custodial interrogation'". *Id.* at 2611 (internal quotations omitted). It therefore appears that Justice Breyer's "good-faith" exception encompasses situations in which the police

Rather, the *Seibert* plurality held that the defendant's post-*Miranda* statements were inadmissible because, objectively viewing the circumstances from the defendant's position, the administration of *Miranda* warnings in the middle of the interview could not have adequately apprised the defendant of "the nature of [her] rights and the consequences of abandoning them".[25]

The *Seibert* dissenters were unwilling to join the plurality because they concluded that the plurality's analysis of the "effectiveness" of the *Miranda* warnings was "indistinguishable" from the "cat out of the bag" analysis that was rejected in *Elstad*.[26] However, even the dissenters acknowledged that the police might have violated Seibert's rights. Quoting *Elstad*, Justice O'Connor wrote:

"The relevant inquiry is whether, in fact, the [post-*Miranda*] statement was . . . voluntarily made. . . . [The court] must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." [*Elstad*, 470 U.S. at 318, 105 S.Ct. at 1298.] Although I would leave this analysis for the Missouri courts to conduct on remand, I note that, unlike the officers in *Elstad*, [the officer in Seibert's case] referred to Seibert's unwarned statement during the second part of the interrogation when [Seibert] made a statement at odds with her [earlier] unwarned confession. . . . (" 'Trice, didn't you tell me that [the boy] was supposed to die in his sleep?' "); *cf. Elstad*, *supra*, at 316, 105 S.Ct. 1285 . . . (officers did not "exploit the unwarned admission to pressure respondent into waiving his right to remain silent"). Such a tactic may bear on the voluntariness inquiry.

*Seibert*, 124 S.Ct. at 2619–2620 (O'Connor, J., dissenting).

We now return to the facts of the interrogation in the present case. Analyzing those facts under the federal constitutional law that we have just described, we conclude that we must suppress Crawford's post-*Miranda* reaffirmation that there was cocaine under the seat of his car.

Crawford does not challenge the content of the *Miranda* warnings that he received from Lindell. Thus, we begin with the presumption that Lindell's administration of *Miranda* warnings to Crawford adequately apprised Crawford of his rights to remain silent and to consult an attorney before deciding whether to answer police questions. Moreover, under *Elstad*, we must presume that these *Miranda* warnings dissipated the adverse psychological effects that normally attend a custodial interrogation, and we must further presume that these *Miranda* warnings insulated Crawford from the psychological pressures potentially exerted by his earlier unwarned admissions. Nevertheless, we find that the facts of Crawford's case rebut these presumptions.

As explained earlier in this opinion, Lindell arrested Crawford for driving with a revoked license. Following this formal arrest, with Crawford in handcuffs, Lindell searched Crawford's pockets and found a small pipe that smelled of marijuana. Upon discovering the pipe, Lindell asked Crawford if he had anything else in his pockets; Crawford admitted that he had a small can of marijuana, and Lindell retrieved this marijuana from Crawford's pocket. Lindell then questioned Crawford about the contents of Crawford's vehicle; he asked Crawford if there were any more drugs in the car. At this point, Crawford admitted that there was cocaine under the seat. That is, Crawford admitted that he was guilty of a felony.

Upon hearing this, Lindell took Crawford to the patrol car and, for the first time, advised Crawford of his *Miranda* rights. Crawford waived his *Miranda* rights and agreed to further questioning.

Lindell began this post-*Miranda* questioning by immediately reminding Crawford that he had just confessed to possessing cocaine under the seat of his car. (Lindell said to

---

reasonably but mistakenly conclude that they are not subjecting the suspect to "custodial interrogation" for *Miranda* purposes.

**25.** *Id.* at 2611 (citations and internal quotation omitted).

**26.** *Id.* at 2619.

Crawford, "Like we were talking about before, you had said you had coke under the seat.") Lindell then questioned Crawford further about the cocaine.

Viewing the facts objectively, from the perspective of a person in Crawford's position, Crawford was subjected to a continuing interrogation about his possession of cocaine, with *Miranda* warnings inserted midstream, with barely an interruption, and after Crawford had already confessed to this crime. Employing the analysis adopted by the plurality in *Seibert*, we conclude that this midstream administration of *Miranda* warnings did not effectively apprise Crawford of "the nature of his rights and the consequences of abandoning them".[27] Rather, in these circumstances, when Crawford heard the *Miranda* warning that any statements he made could be used against him, Crawford could reasonably conclude that his earlier unwarned admissions *would* be used against him—thus removing any incentive for Crawford to invoke his right to silence when Lindell immediately asked Crawford to re-affirm those admissions.

(Compare *Graham v. State*, 633 P.2d 211 (Alaska 1981), where our supreme court acknowledged that *Miranda* warnings can be misleading in another context. The problem presented in *Graham* involved motorists arrested for driving under the influence who receive both *Miranda* warnings and the implied consent warning that precedes the mandatory breath test. On the one hand, the *Miranda* warnings tell motorists that they have the right to remain silent and the right to have an attorney present. But the implied consent warning tells motorists that they have no right to refuse to take the breath test, and that they must promptly decide whether to take the test, regardless of whether they are able to locate and speak to an attorney first. As our supreme court noted, "There is always the danger, therefore, that the arrested person may be misled into believing that he or she either has a right to have counsel present before deciding whether to take the test, or can refuse to submit to the test without suffering the threatened consequences of that refusal."[28] For this reason, the supreme court held that "[whenever] an arrested person refuses to submit to a [breath] test, the administering officer must inquire into the nature of the refusal and, if it appears that the refusal is based on a confusion about [the] person's rights, the officer must clearly advise that person that the rights contained in the *Miranda* warning do not apply to the [breath test]."[29])

We further conclude that Crawford's post-*Miranda* statements must be suppressed even under the broader reading of *Elstad* advocated by the *Seibert* dissenters. As explained above, *Elstad* holds that, following the administration of *Miranda* warnings, "[a] suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an act of free will". But *Elstad* itself recognizes that this presumption can be rebutted if the police "exploit the [earlier] unwarned admission" in a way that pressures the suspect into waiving their rights. We find that this "exploitation" exception applies in Crawford's case.

We acknowledge that Lindell did not subject Crawford to a lengthy interrogation before he administered the *Miranda* warnings to Crawford. However, for purposes of Lindell's investigation into Crawford's illegal possession of drugs, this short pre-warning interrogation was sufficient: Lindell elicited Crawford's confession that he knowingly possessed the cocaine under the seat of his car.

Immediately after Lindell elicited this confession, he administered *Miranda* warnings to Crawford—and then, essentially without pause, Lindell reminded Crawford of this confession and asked him to re-affirm it. Under these circumstances, we conclude that Crawford's post-*Miranda* admission stemmed from an improper exploitation of his earlier statement taken in violation of *Miranda*. Thus, the *Elstad* presumption is rebutted, and Crawford's post-*Miranda* statements are inadmissible.

**27.** *Seibert,* 124 S.Ct. at 2611.

**28.** *Graham,* 633 P.2d at 214–15.

**29.** *Id.* at 215.

In reaching this conclusion, we are mindful that Judge Beistline, in his written decision, stated that he believed that Crawford willingly chose to confess, and that Crawford's post-*Miranda* statements were apparently motivated by the belief "that open communication with the police regarding items [that] the police were likely to find [in their] search [of the car] was preferable and more beneficial to [Crawford, because it showed that] he was cooperative."

But it is clear that Judge Beistline did not rely on his conclusions about Crawford's motive for confessing. As the judge himself conceded (immediately after making the above-quoted statement), "determining a defendant's actual subjective belief ... at the time statements were made ... is purely speculative."

Moreover, Crawford's subjective reasons for deciding to confess are legally irrelevant to a *Miranda* analysis. Both the *Seibert* plurality and the *Seibert* dissenters expressly re-affirm and adhere to the doctrine that *Miranda* rulings hinge on an objective view of the facts of the interrogation, not on an inquiry into the subjective motives of either the police interrogator or the suspect.

(Alaska law is the same. See *State v. Smith*, 38 P.3d 1149, 1158 (Alaska 2002), in which the supreme court stated that a person's subjective belief as to whether they are in custody is not controlling. And see *Aningayou v. State*, 949 P.2d 963, 968 (Alaska App.1997), in which this Court held that the assessment of whether a person is in custody for *Miranda* purposes must be made "irrespective of [the officer's] subjective belief that [the person is] not a suspect" in the crime being investigated.)

### Conclusion

For the reasons explained here, we conclude that Crawford's post-*Miranda* statements must be suppressed under federal law. We therefore need not decide whether, as a matter of state constitutional law, we should adhere to *Brown's* "dissipation of taint" analysis or instead adopt the newer analyses embodied in either *Elstad* or *Seibert*.

The judgement of the superior court is REVERSED. Crawford is entitled to a new trial.