**Thomas E. KLEMZ, Appellant,**

**v.**

**STATE of Alaska, Appellee.**

**No. A–9553.**

Court of Appeals of Alaska.

Nov. 30, 2007.

---

☞412.2(3)

Renee McFarland, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for the Appellee.

Before: Coats, Chief Judge, and Mannheimer and Stewart, Judges.

### OPINION

MANNHEIMER, Judge.

Thomas E. Klemz, who was on felony probation for driving under the influence, arrived for a meeting with his Kenai probation officer, Ruben Foster. While Klemz was sitting in the lobby of the probation office, another probation officer (Steven Meyer) walked by and noticed that Klemz smelled of alcoholic beverages. One of Klemz's conditions of probation prohibited him from drinking alcoholic beverages, so Meyer reported his discovery to Foster, and Klemz was brought to Foster's office.

At Foster's request, Klemz submitted to a breath test, and the result of this test showed that Klemz had a blood alcohol level of .221 percent. (The legal limit for driving in Alaska is .08 percent.)[1] Foster then arrested Klemz for violating the conditions of his probation. Foster searched Klemz and then handcuffed him in preparation for transporting him to the Wildwood Correctional Center—but Foster did not advise Klemz of his *Miranda* rights.

---

1. *See* AS 28.35.030(a)(2).

As Foster and Meyer escorted Klemz down the hall, Foster asked Klemz how he had gotten to the probation office. Klemz responded that he had driven there in his truck. Meyer then asked Klemz if he meant that he had driven himself, or that somebody else had driven him. Klemz answered that he had driven himself, and that his truck was parked right outside in the parking lot.

Because Klemz's statement was tantamount to a confession that he had committed a new felony (felony driving under the influence), Foster took Klemz back to his office and called the Kenai police.

Kenai Police Officer Casey Hershberger arrived at the probation office between five and fifteen minutes later. Foster informed Hershberger that Klemz had a blood alcohol level of .221 percent, and that Klemz had driven to his appointment at the probation office. Hershberger escorted Klemz back outside and told him, "You obviously drove over here, and you've obviously ... [, so] I gotta ask you a couple of questions." The officer then read the *Miranda* warnings to Klemz in a rapid monotone—and Klemz waived his rights.

Klemz asked Hershberger if he could put his sunglasses in his truck. Hershberger told Klemz that he could, and then the officer said to Klemz: "Obviously, you've been driving the vehicle, and obviously you've had a little bit of alcohol." Hershberger then asked Klemz how long ago he had driven his truck, and whether he had driven alone. In responding to these questions, Klemz again admitted that he had driven his truck. After administering field sobriety tests to Klemz, Hershberger arrested him for felony driving under the influence.

Klemz's self-incriminating statements to Foster and Hershberger were the State's only direct evidence that Klemz drove to his appointment at the probation office. In fact, Klemz and the State agreed to litigate the new DUI charge at a bench trial on stipulated facts—and Klemz's statements to the probation officer and the police officer were the only evidence offered by the State on the issue of whether Klemz drove the motor vehicle.

Before that trial, Klemz's attorney asked the superior court to suppress these statements. The defense attorney argued that Klemz's initial statement to Foster and Klemz's later statement to the police officer were both the fruit of Foster's interrogation—a custodial interrogation that had not been preceded by *Miranda* warnings.

At the ensuing hearing on Klemz's suppression motion, Foster testified that his main purpose in asking Klemz how he had come to the probation office was to find out if Klemz had a friend or family member waiting for him—someone who should now be notified that Klemz had been arrested and was being taken to jail. The other probation officer who was present when Klemz was arrested, Steven Meyer, testified that Foster's question was "totally routine" and was asked as a courtesy. Foster conceded, however, that he had an additional reason for asking his question: a desire to find out if Klemz had violated any other conditions of probation—in particular, the condition that prohibited Klemz from committing any new crimes.

Superior Court Judge Charles T. Huguelet ruled that, even though Klemz was in custody when Foster questioned him, Foster did not need to administer *Miranda* warnings to Klemz, nor did Foster need to obtain Klemz's waiver of rights, before asking Klemz whether he had driven himself to the probation office. Judge Huguelet concluded that *Miranda* was inapplicable in this situation because Foster's question (*i.e.*, his inquiry as to how Klemz had gotten to the probation office) was a "routine courtesy"—a question aimed at discovering whether a family member or friend might be waiting in the lobby or outside the building for Klemz to be done with his appointment (*i.e.*, a person who should now be alerted that Klemz was under arrest and was being taken to jail).

Judge Huguelet acknowledged that, according to the testimony presented at the evidentiary hearing, Foster had a second purpose in asking his question—the desire "to know if Mr. Klemz had violated the law and [the] conditions of his probation by driving". However, the judge concluded that "[t]he fact that Mr. Foster may have had a

secondary reason ... for asking how Mr. Klemz got to the probation office does not convert [Foster's] question into an interrogation for *Miranda* purposes."

■ We disagree with the superior court's ruling on this issue. After Foster took Klemz into custody for violating his probation (by drinking alcoholic beverages), Foster then asked Klemz a question which, given the circumstances, was reasonably likely to elicit a self-incriminating statement from Klemz. Foster's question therefore constituted "interrogation" for *Miranda* purposes, as defined in *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689–1690, 64 L.Ed.2d 297 (1980).

Indeed, Foster admitted (during his testimony) that one of his conscious purposes for asking this question was to elicit information as to whether Klemz had committed a new crime. The fact that Foster may also have had a plausible administrative purpose for asking his question does not negate the *Miranda* violation if Foster's question constituted "interrogation" as defined in *Innis*, and if this interrogation occurred before Klemz was apprised of, and waived, his rights under *Miranda*.

■ In other words, a question is not exempt from the *Innis* definition of "interrogation" merely because the law enforcement officer who asked the question may have had an administrative purpose for doing so. Even a purely administrative question may constitute custodial interrogation if, under the circumstances, a reasonable person would know that the question was likely to elicit an incriminating response. *See State v. Rossignol*, 627 A.2d 524, 526 (Me.1993) (collecting federal cases on this point).

In *Rossignol*, a police officer asked a drunk driving suspect about her possession or ownership of a vehicle found in the middle of the road. The Maine Supreme Court held that the officer's inquiry did not fall within the administrative question exception to *Miranda*—because the officer's question was "reasonably likely to elicit a response [that would be] material to the proof of [the suspect's] operation of that vehicle, an element of the offense of which [she] was a suspect." *Id.* at 526.

■ As *Rossignol* recognizes, the *Innis* test for what constitutes "interrogation" is an objective test: it includes not only questions that the officer subjectively knew were likely to elicit an incriminating response, but also questions that the officer "*should have known* were reasonably likely to elicit an incriminating response". *Innis*, 446 U.S. at 302, 100 S.Ct. at 1690 (emphasis in the original).

As the Fifth Circuit emphasized in *United States v. Webb*, 755 F.2d 382 (5th Cir.1985), the subjective intent of the law enforcement officer is relevant "only to the extent that it bears on whether the [officer] should have known that their words or actions were reasonably likely to evoke an incriminating response." *Id.* at 388.

In *Webb*, a jail classification officer asked the defendant, "[W]hat kind of shit did you get yourself into?"[2] The defendant responded, "I murdered my son and buried him in the desert."[3] The classification officer later testified that the purpose of this question was administrative—in particular, to determine where in the jail population the defendant should be placed.[4] Based on this testimony, the government claimed that the jail officer's question was an "administrative question" that was normally attendant to custody, and that the question was therefore exempt from the *Innis* definition of "interrogation."[5] But the Fifth Circuit rejected this argument. The court noted, among other things, that the jail classification officer already knew that the defendant had been charged with murder, and that another jail classification officer had testified that it was not normal procedure to ask a defendant to comment upon or explain the charge against him.[6]

2. *Id.* at 386.

3. *Id.*

4. *Id.*

5. *Id.*, 755 F.2d at 388–89.

6. *Id.* at 389.

Other courts have likewise emphasized that the *Innis* test focuses on the reasonable likelihood of an incriminating response, rather than the officer's potential administrative interest in asking the question. For instance, a Texas appeals court held that a suspect had been subjected to custodial interrogation at the jail when a trooper asked him where he had been going when he was pulled over, when and what he had last eaten, and whether he had consumed an alcoholic beverage—because, under *Innis,* these questions were "reasonably likely to elicit an incriminating response." [7]   And an Illinois court held that a drunk driving suspect was interrogated in violation of *Miranda* when the police asked him if the motorcycle he was driving belonged to him, whether it was registered in his name, and whether it was insured and had valid license plates—because these questions were likely to evoke an incriminating response that could result in more charges if the motorcycle was, for instance, stolen or not registered.[8]

Returning to the facts of Klemz's case, Judge Huguelet found that Probation Officer Foster's primary purpose in asking Klemz how he had come to the probation office was to find out, as a "routine courtesy", whether there was anyone waiting for Klemz in the lobby or in the parking lot.

This finding is indeed supported by the testimony presented at the suppression hearing. But this finding does not support the judge's legal conclusion—the conclusion that the officer's question was not "interrogation" for purposes of the *Miranda* rule. The pertinent question, under *Innis,* is whether Foster's question was reasonably likely to elicit an incriminating response under the circumstances.

Here, Klemz was on probation for felony driving while intoxicated. He arrived at a scheduled probation appointment smelling of alcoholic beverages. Klemz took a breath test at the request of his probation officer, and the test showed that he had a blood alcohol level of .221 percent. Following this test, Foster arrested Klemz for violating his

probation (the condition that barred him from consuming alcoholic beverages). Foster handcuffed Klemz and started to transport him to jail. As they were walking down the hall of the probation office, Foster asked Klemz how he had gotten to the probation office. Klemz answered that he had driven there in his truck. Foster's fellow probation officer, Meyer, then asked Klemz to clarify whether he meant that he had driven the truck himself, and Klemz answered that this was so.

Given these circumstances, Foster's initial question was reasonably likely to elicit an incriminating response from Klemz—and Meyer's follow-up question was almost certain to do so. It makes no difference, under *Innis,* that Foster may have had a plausible administrative reason for asking his question, and it further makes no difference that Foster and Meyer may have been subjectively surprised that Klemz would admit committing a new felony.

In other words, the superior court committed error in ruling Klemz was not subjected to custodial interrogation for purposes of *Miranda.* Klemz was in custody, he was not warned of his rights, and he was questioned in a way that was reasonably likely to elicit an incriminating response. Klemz is therefore entitled to suppression of the statements he made in response to the questions posed by Foster and Meyer.

■ This conclusion—that Foster and Meyer violated Klemz's rights when they asked Klemz how he had gotten to his appointment at the probation office—requires us to resolve an issue that Judge Huguelet never addressed: whether this violation of Klemz's *Miranda* rights requires suppression, not only of Klemz's confession to Foster and Meyer, but also of Klemz's later reiteration of that confession to Officer Hershberger.

As explained above, Hershberger administered *Miranda* warnings to Klemz, and obtained Klemz's waiver of his rights, before asking Klemz to confirm that he had driven his vehicle to the probation office. Thus, the

7.  *Branch v. State,* 932 S.W.2d 577, 581 (Texas App.1995).

8.  *People v. Pierce,* 285 Ill.App.3d 5, 220 Ill.Dec. 606, 673 N.E.2d 750, 751–52 (1997).

legal question to be resolved is whether the police officer's administration of these *Miranda* warnings to Klemz was sufficient to insulate Klemz's ensuing self-incriminating statements from the taint of the earlier *Miranda* violation.

Most often, the resolution of this kind of issue would require findings of historical fact, and we would have to remand the case to the lower court with directions to make the needed findings of fact. In the present case, however, all pertinent aspects of Klemz's interaction with the police officer were tape recorded—and, with the exception of the first two minutes and ten seconds of that interaction, videotaped. Moreover, in their briefs to this Court, the parties do not disagree regarding any pertinent facts.

Thus, the only remaining task is to legally categorize the facts of the case. In this kind of situation, we (as an appellate court) have the authority to resolve the *Miranda* taint issue even though the superior court did not reach this issue. And, as we are about to explain, we conclude that, despite Hershberger's administration of *Miranda* warnings, Klemz's statements to Hershberger were indeed tainted by the earlier *Miranda* violation, even under the rule of *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

We confronted a similar factual situation in *Crawford v. State*, 100 P.3d 440 (Alaska App. 2004). The defendant in *Crawford* was arrested for driving with a revoked license, but he was not immediately given *Miranda* warnings. During post-arrest questioning, Crawford admitted that there was cocaine under the seat of his vehicle.[9] As soon as Crawford admitted this additional crime, the arresting officer took Crawford back to his patrol car and, for the first time, advised Crawford of his *Miranda* rights.[10] Crawford waived his *Miranda* rights and agreed to further questioning.[11]

As we described in our *Crawford* opinion, the arresting officer "began this post-*Miranda* questioning by reminding Crawford of the things he had previously admitted—in particular, his possession of . . . cocaine under the seat of his car."[12] The officer questioned Crawford further about this cocaine, and then he obtained Crawford's consent to search the car.[13] After receiving this consent, the officer entered Crawford's car and found a bag of cocaine under the driver's seat.[14]

We held that, even though Crawford received *Miranda* warnings, the statements he made about the cocaine after receiving those *Miranda* warnings had to be suppressed under federal law.[15]

In reaching this conclusion, we acknowledged that, under the Supreme Court's decision in *Oregon v. Elstad*, all of the statements that Crawford made after receiving *Miranda* warnings (and after waiving his rights) were presumptively admissible against him.[16] Under *Elstad*, federal law presumes that "once *Miranda* warnings have been given, thus apprising the suspect of the constitutional rights to silence and to the assistance of counsel, 'the suspect's choice whether to exercise his privilege to remain silent should [thereafter] ordinarily be viewed as an act of free will'." *Crawford*, 100 P.3d at 446–47 (quoting *Elstad*, 470 U.S. at 311, 105 S.Ct. at 1294).

But as we also pointed out in *Crawford*, the *Elstad* decision "acknowledges that there may be instances in which defendants can show that, despite receiving *Miranda* warnings, they were nevertheless illegally pressured to continue speaking-instances in which the police 'exploit the [earlier] unwarned admission to pressure [the defendant] into waiving his [or her] right to remain silent'." *Crawford*, 100 P.3d at 447

9. *Id.* at 442.

10. *Id.*

11. *Id.*

12. *Id.*

13. *Id.*

14. *Id.*

15. *Id.* at 450–51.

16. *Id.* at 446–47.

(quoting *Elstad,* 470 U.S. at 316, 105 S.Ct. at 1296).

We concluded that Crawford's case was one of this latter type—an instance in which the police improperly exploited Crawford's unwarned confession to obtain a post-warning reiteration of that confession.

We pointed out that Crawford was arrested, handcuffed, and then questioned without being advised of his rights. During this pre-warning interrogation, Crawford admitted that he was guilty of a felony (possession of cocaine). Upon hearing this, the arresting officer advised Crawford of his *Miranda* rights—but then the officer began his post-warning interrogation "by immediately reminding Crawford that he had just confessed to possessing cocaine under the seat of his car", and by questioning Crawford further about the cocaine.[17] We concluded that, viewing these facts objectively,

> Crawford was subjected to a continuing interrogation about his possession of cocaine, with *Miranda* warnings inserted midstream, with barely an interruption, and after Crawford had already confessed to this crime.... [W]e conclude that this midstream administration of *Miranda* warnings did not effectively apprise Crawford of the nature of his rights and the consequences of abandoning them. Rather, in these circumstances, when Crawford heard the *Miranda* warning that any statements he made could be used against him, Crawford could reasonably conclude that his earlier unwarned admissions *would* be used against him—thus removing any incentive for Crawford to invoke his right to silence when [the arresting officer] immediately asked Crawford to re-affirm those admissions.
>
> . . .
>
> We acknowledge that [the officer] did not subject Crawford to a lengthy interrogation before he administered the *Miranda* warnings to Crawford. However, for purposes of [the officer's] investigation into Crawford's illegal possession of drugs, this short pre-warning interrogation was sufficient: [the officer] elicited Crawford's

confession that he knowingly possessed the cocaine under the seat of his car.

> Immediately after ... elicit[ing] this confession, [the officer] administered *Miranda* warnings to Crawford—and then, essentially without pause, [the officer] reminded Crawford of this confession and asked him to re-affirm it. Under these circumstances, we conclude that Crawford's post-*Miranda* admission stemmed from an improper exploitation of his earlier statement taken in violation of *Miranda.* Thus, the *Elstad* presumption is rebutted, and Crawford's post-*Miranda* statements are inadmissible.

*Crawford,* 100 P.3d at 450 (internal quotations and footnotes omitted).

The facts of Klemz's case differ slightly from the facts of *Crawford,* but not in any significant way.

Klemz's probation officer (Foster) arrested Klemz for a violation of his probation (drinking alcoholic beverages). Foster handcuffed Klemz and then, assisted by another probation officer (Meyer), he began escorting Klemz to jail. Even though both probation officers knew (based on the breath test) that Klemz's blood alcohol level was almost three times the legal limit for driving, neither officer warned Klemz of his *Miranda* rights. Instead, as the three men were walking out of the building, both Foster and Meyer put questions to Klemz that could reasonably be expected to elicit incriminating responses—questions concerning whether Klemz had driven to the probation office.

As soon as Klemz admitted that he had driven himself to the probation office, Foster and Meyer took Klemz back inside and summoned the police. Officer Hershberger arrived within fifteen minutes (and perhaps as quickly as five minutes).

When Hershberger arrived, Foster apprised him that Klemz had a blood alcohol level of .221 percent, and that Klemz had driven to his appointment at the probation office. Hershberger then took Klemz outside, accompanied by one of the probation officers. Hershberger's first words of substance to Klemz were: "Here's the deal,

---

**17.** *Crawford,* 100 P.3d at 449–450.

Tom. . . . You obviously drove over here, and you've obviously . . . [, so] I gotta ask you a couple of questions."

Hershberger then read the *Miranda* warnings to Klemz—although we note that he did so in a fast-paced monotone, without pause. Hershberger then asked Klemz if he understood these rights and if he was willing to talk. Klemz said yes.

Hershberger's next words of substance to Klemz were a renewed assertion that it was "obvious" that Klemz had committed a new felony: "Obviously, you've been driving the vehicle, and obviously you've had a little bit of alcohol." Klemz then repeated his confession that he had driven his truck to his appointment at the probation office. Both of the probation officers was present during Hershberger's conversation with Klemz. That is, the officials who had heard Klemz make his initial unwarned confession were standing by, apparently ready to step in if Klemz decided to retract or deny his earlier admission that he had driven his truck to the probation office. To a reasonable person in Klemz's situation, the presence of the probation officer would have reinforced the perception that it was pointless to invoke the *Miranda* right to silence.

In other words, just like the defendant in *Crawford,* Klemz was subjected to a continuing interrogation about his new offense— felony DUI—"with *Miranda* warnings inserted midstream, with barely an interruption, and after [Klemz] had already confessed to this crime."[18]

As in *Crawford,* we conclude that this midstream administration of *Miranda* warnings did not effectively apprise Klemz of the nature of his rights and the consequences of abandoning them. Klemz's post-warning reiteration of his confession stemmed from an improper exploitation of his earlier confession—the one obtained in violation of *Miranda.* Thus, the *Elstad* presumption is rebutted, and Klemz's post-warning statements are no more admissible than his pre-warning statements.

In other words, the superior court should have suppressed all of the challenged statements in this case. Accordingly, the judgement of the superior court is REVERSED, and Klemz is entitled to a new trial.

---

18. *Crawford,* 100 P.3d at 450.